**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

|  |  |
|---|---|
| GARY ZAGAMI, Individually and on Behalf of All Others Similarly Situated, <br><br> *Plaintiff*, <br><br> v. <br><br> WOLFSPEED, INC., GREGG A. LOWE, and NEILL P. REYNOLDS, <br><br> *Defendants*. | No. 1:26-cv-00018-LAF-LPA <br><br> <u>**ORAL ARGUMENT REQUESTED**</u> |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

# **TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................. 1

NATURE OF THE MATTER ........................................................................................... 3

FACTS ............................................................................................................................. 3

      A.     Wolfspeed and the Individual Defendants ................................................ 3

      B.     Silicon Carbide Growth and the Mohawk Valley Fabrication
           Facility ..................................................................................................... 4

      C.     Demand for Wolfspeed's Products ........................................................... 5

      D.     November 6, 2024 Earnings, This Action, and Chapter 11
           Bankruptcy ............................................................................................... 6

QUESTIONS PRESENTED .............................................................................................. 7

ARGUMENT .................................................................................................................... 7

      I.     THE COMPLAINT FAILS TO ALLEGE A FALSE OR MISLEADING
          STATEMENT ........................................................................................... 9

          A.     Plaintiffs Fail to Allege That Defendants' Statements Were False .......... 10

          B.     Many of the Challenged Statements Are Inactionable Because
             They Are Forward-Looking, Puffery, or Opinion ................................... 18

      II.    THE COMPLAINT FAILS TO RAISE A STRONG INFERENCE OF
          SCIENTER ............................................................................................... 26

          A.     Plaintiffs Fail to Plead Motive ................................................................ 27

          B.     The FEs' Allegations Do Not Plead the Scienter of the Individual
             Defendants .............................................................................................. 28

          C.     Plaintiffs' Fallback Theories of Scienter Fail ......................................... 30

      III.   PLAINTIFFS' SECTION 20(A) CLAIM FAILS ................................................. 34

CONCLUSION ................................................................................................................. 34

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................3, 8

*In re Biogen Inc. Sec. Litig.*,
193 F. Supp. 3d 5 (D. Mass. 2016) ...................................................................24

*In re BioScrip Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)..................................................................29

*Boykin v. K12, Inc.*,
54 F.4th 175 (4th Cir. 2022) ............................................................................25

*Chapman v. Fennec Pharms. Inc.*,
2021 WL 7209981 (M.D.N.C. Dec. 16, 2021) ................................... 21, 23, 24

*City of Southfield Gen. Emps. Ret. Sys. v. Advance Auto Parts, Inc.*,
2026 WL 438677 (4th Cir. Feb. 17, 2026) ...........................................*passim*

*Cozzarelli v. Inspire Pharm. Inc.*,
549 F.3d 618 (4th Cir. 2008) .............................................................................8

*In re Cree, Inc. Sec. Litig.*,
2005 WL 1847004 (M.D.N.C. Aug. 2, 2005), *aff'd sub nom. Teachers'*
*Ret. Sys. of La. v. Hunter*, 477 F.3d 162 (4th Cir. 2007) ...............................11

*In re DXC Tech. Co. Sec. Litig.*,
2020 WL 3456129 (E.D. Va. June 2, 2020), *aff'd sub nom. KBC Asset*
*Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601 (4th Cir. 2021)............................25

*In re Elan Corp. Sec. Litig.*,
543 F. Supp. 2d 187 (S.D.N.Y. 2008)...............................................................27

*Elec. Workers Pension Tr. Fund of IBEW Loc. Union No. 58 v.*
*CommScope, Inc.*,
2013 WL 4014978 (W.D.N.C. Aug. 6, 2013)....................................................20

*Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*,
61 F.4th 369 (4th Cir. 2023) ....................................................................*passim*

*Fanucchi v. Enviva Inc.*,
2024 WL 3302564 (D. Md. July 3, 2024).............................................. 11, 13

*In re First Union Corp. Sec. Litig.*,
128 F. Supp. 2d 871 (W.D.N.C. 2001) ......................................................... 9

*Gross v. AT&T*,
2021 WL 9803956 (S.D.N.Y. Sep. 27, 2021), *aff'd sub nom.*
*Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853
(2d Cir. Dec. 13, 2022) ............................................................................. 12

*In re Humphrey Hosp. Tr., Inc. Sec. Litig.*,
219 F. Supp. 2d 675 (D. Md. 2002) ........................................................... 19

*In re Indivior PLC Sec. Litig.*,
2025 WL 2242758 (E.D. Va. Aug. 6, 2025).............................................. 25

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) ....................................................................*passim*

*SEC v. Kelly*,
817 F. Supp. 2d 340 (S.D.N.Y. 2011)........................................................ 33

*In re Lab'y Corp. of Am. Holdings Sec. Litig.*,
2006 WL 1367428 (M.D.N.C. May 18, 2006) .......................................... 21

*Leacock v. IonQ, Inc.*,
2023 WL 6308045 (D. Md. Sep. 28, 2023) .......................................... 11, 12

*In re Lehman Bros. Sec. & ERISA Litig.*,
2013 WL 3989066 (S.D.N.Y. July 31, 2013)............................................ 11

*Maguire Financial, LP v. PowerSecure Int'l, Inc.*,
876 F.3d 541 (4th Cir. 2017) ............................................................... 30, 31

*In re Marriott Int'l Inc., Customer Data Sec. Breach Litig.*,
543 F. Supp. 3d 96 (D. Md. 2021) ............................................................. 29

*In re Metawave Commc'ns Corp. Sec. Litig.*,
298 F. Supp. 2d 1056 (W.D. Wash. 2003)................................................. 29

iv

*In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*,
876 F. Supp. 2d 616 (D. Md. 2012), *aff'd sub nom. Yates v. Mun.
Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014)................................................... 13

*Oklahoma Firefighters Pension & Ret. Sys. v. K12, Inc.*,
66 F. Supp. 3d 711 (E.D. Va. 2014) .............................................................. 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)....................................................................................... 25

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
353 F.3d 338 (4th Cir. 2003) ......................................................................... 27

*Phillips v. Triad Guar. Inc.*,
2015 WL 1457980 (M.D.N.C. Mar. 30, 2015)............................................... 18

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*,
2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) ....................................... 18, 29

*Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*,
966 F. Supp. 2d 525 (M.D.N.C. 2013) ................................................*passim*

*Pollio v. MF Global, Ltd.*,
608 F. Supp. 2d 564 (S.D.N.Y. 2009)............................................................ 24

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
75 F.4th 232 (4th Cir. 2023) ................................................................*passim*

*Teachers' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ...............................................................*passim*

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)....................................................................................... 26

*TransEnterix Inv. Grp. v. TransEnterix, Inc.*,
272 F. Supp. 3d 740 (E.D.N.C. 2017)........................................................... 23

*In re Trex Co., Inc. Sec. Litig.*,
454 F. Supp. 2d 560 (W.D. Va. 2006) .......................................... 13, 16, 18

*In re Triangle Capital Corp. Sec. Litig.*,
988 F.3d 743 (4th Cir. 2021) ........................................................................ 33

v

*In re Under Armour Sec. Litig.*,
    342 F. Supp. 3d 658 (D. Md. 2018) ............................................................................. 13

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ...............................................................*passim*

**Statutes**

15 U.S.C. § 78j(b) [Securities Exchange Act of 1934 § 10(b)] ........................... 3, 7, 8, 26

15 U.S.C. § 78t(a) [Securities Exchange Act of 1934 § 20(a)] .......................................... 3

15 U.S.C. § 78u-4 [Private Securities Litigation Reform Act of 1995] ....................*passim*

15 U.S.C. § 78u-5 ....................................................................................... 18, 19, 23

**Regulations & Rules**

17 C.F.R. § 240.10b-5 ................................................................................... 3, 7, 8

Fed. R. Civ. P. 9(b) ............................................................................................. 1, 8

Fed. R. Civ. P. 12(b)(6) .................................................................................... 1, 8, 14

Defendants Wolfspeed, Inc. ("Wolfspeed" or the "Company"), Gregg Lowe, and Neill Reynolds submit this memorandum of law in support of their Motion to Dismiss the Consolidated Amended Complaint ("Complaint") pursuant to FRCP 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(3) ("PSLRA").

## INTRODUCTION

This case is an attempt to turn a business setback into securities fraud. Wolfspeed develops silicon carbide ("SiC"), an energy-efficient semiconductor technology used in power applications such as electric vehicles ("EV"). In April 2022, the Company opened the Mohawk Valley Silicon Carbide Fabrication Facility ("MVF" or "fab") in Marcy, New York to produce cutting-edge SiC technology and remain competitive in the industry amid growing demand in the EV market. The MVF experienced the typical growing pains that the Company had cautioned would occur with launching a first-of-its-kind manufacturing facility, but Wolfspeed kept the market informed of its efforts to ramp production and ultimately met its key production goal in June 2024. And when industry-wide demand began to slow in early 2024 as the downstream EV market experienced unforeseen headwinds, Wolfspeed's management acknowledged the market slowdown and reduced the Company's revenue guidance. At the same time, Wolfspeed remained optimistic about its ability to weather the slowdown. Ultimately, though, demand decreased more than expected in FY25Q1 as Wolfspeed's customers began pushing out orders. In its November 6, 2024 earnings call, Wolfspeed announced it had missed its projected MVF revenue for

1

the quarter by approximately $1 million and reduced its MVF guidance from $100 million by end of calendar year 2024 to $50 to $70 million by end of FY25Q2.

From this unforeseen business development, Plaintiffs seek to concoct a claim of securities fraud, alleging that Wolfspeed knew all along that its projections were unachievable and that it misrepresented the demand for Wolfspeed's products. They challenge numerous statements in Wolfspeed's public filings from August 16, 2023 to November 6, 2024.

*First*, Plaintiffs do not plead that any of the challenged statements were false or misleading when made. The *only* support Plaintiffs allege is the uncorroborated statements of two confidential former employees ("FEs"), who offer nothing beyond vague and conclusory allegations unsupported by specific facts, their own personal opinions, and hearsay—all of which fail to satisfy the heightened standards for pleading securities fraud.

*Second*, many of the challenged statements are non-actionable as a matter of law, because they are protected by the PSLRA safe harbor for forward-looking statements, or because they are inactionable statements of opinion or corporate optimism.

*Finally*, Plaintiffs do not plead a strong inference of scienter with respect to any challenged statement. The Complaint contains *no* viable motive to commit securities fraud and no particularized facts that show either Individual Defendant acted with the requisite state of mind. Indeed, the FEs do not allege *any* interaction with the Individual Defendants. As the Fourth Circuit just held in *City of Southfield Gen. Emps. Ret. Sys. v. Advance Auto Parts, Inc.*, securities fraud claims fail where the "more compelling inference" is that

Defendants "acted innocently—or even negligently[.]" 2026 WL 438677, at *4 (4th Cir. Feb. 17, 2026). That is the case here.

The Court should grant the motion and dismiss all claims with prejudice.

## NATURE OF THE MATTER

Plaintiffs allege that Defendants violated § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5, as well as § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). ¶¶ 287–302.

## FACTS

### A. Wolfspeed and the Individual Defendants

Founded in 1987 and headquartered in Durham, North Carolina, Wolfspeed is an industry leader in the development and manufacturing of SiC, a complex semiconductor technology that is used in power applications, such as EVs, among other things. *See* Ex. 17 at 55.[1]

Lowe served as CEO during the putative class period of August 16, 2023 to November 6, 2024 ("Class Period") and departed in November 2024. *See* ¶¶ 2, 24.[2] Reynolds served as CFO during the Class Period and departed in May 2025. *See* ¶ 25.

---

[1] All exhibits ("Ex.") are attached to the Declaration of Tamar Kaplan-Marans in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint ("Declaration"). As described in Defendants' Request for Consideration Under the Incorporation-By-Reference Doctrine or Judicial Notice, the Court may consider all these exhibits.

[2] All paragraph citations refer to the Complaint. Defendants accept the factual allegations of the Complaint as true solely for purposes of this motion, but do not accept any misleading or incomplete characterizations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**B.** **Silicon Carbide Growth and the Mohawk Valley Fabrication Facility**

SiC has emerged as a primary material used in semiconductors, due to its increased energy efficiency and cost-savings. *See* Ex. 1 at 5, 7. The widespread adoption of SiC, driven in part by the rapid growth in the EV market, created a corresponding "need for more capacity" from semiconductor manufacturers, including Wolfspeed. Ex. 1 at 7. In anticipation of meeting industry demand, Wolfspeed began to transition from producing 150-millimeter SiC wafers to 200-millimeter wafers, an extremely advanced technology, *see* Ex. 1 at 5, Ex. 2 at 5, and in April 2022, opened the MVF. *See* ¶ 31.

### 1. *MVF Ramp-Up and Utilization Rate*

Wolfspeed anticipated—and disclosed—that the MVF would have an extended "ramp-up" before it could produce at capacity or generate meaningful revenue, and that the ramp timing could shift. *See e.g.*, Ex. 1 at 8–9. In April 2023, before the Class Period, Wolfspeed announced that it was targeting 20% utilization of the MVF by June 2024. *See* ¶ 7. Put simply, the "utilization rate" compares the current number of wafer starts per week to the number of wafer starts expected when the MVF is operating at its optimized level. *See* Ex. 11 at 2.

From the outset of the Class Period in August 2023, Wolfspeed continued to disclose updates on the MVF's progress, including efforts to speed up the ramp and remain on target for revenue projections. Ex. 1 at 5; Ex. 2 at 4–5, 8–9. In January 2024, Wolfspeed disclosed that "the normal challenges of ramping a brand-new 200-millimeter fab remain," and that the "ramp will not be linear." Ex. 3 at 5.

4

In May 2024, the Company disclosed that the MVF was at "more than 16% utilization," Ex. 4 at 5, 7, and in June 2024, Wolfspeed announced that the MVF had achieved its projected 20% utilization rate.  *See* Ex. 11 at 1.

### 2.      *MVF Projected Annual Revenue for 2024*

As of the beginning of the Class Period, Wolfspeed projected that the expected June 2024 20% utilization rate would translate to approximately $100 million of quarterly revenue from the MVF in the "second half of the calendar year 2024."  Ex. 1 at 6.  In August 2024,[3] the Company announced an MVF revenue target of $50 to $60 million for FY25Q1.  *Id.* at 8.  The Company emphasized that there would be a two-to-three quarter lag between utilization rate and its expected revenue return.  *See id.* at 12–13; *see also* Ex. 1 at 8.

### C.      **Demand for Wolfspeed's Products**

Wolfspeed was uniquely positioned at the forefront of two transitions: the adoption of SiC in semiconductor manufacturing and, in the downstream market, the transition from internal combustion engines to EVs.  *See* Ex. 3 at 7, 16.  Wolfspeed expected that the EV transition would be "the most disruptive change in the history of the automobile."  Ex. 4 at 10.  In line with its expectations, Wolfspeed reported significant customer demand throughout the Class Period.  Ex. 3 at 9; Ex. 4 at 6.  Wolfspeed also disclosed the broader market demand fluctuations.  For example, in January 2024, Wolfspeed disclosed that

---

[3]      As noted in the Complaint, Wolfspeed's fiscal year ends in June of each year. Accordingly, Wolfspeed's first fiscal quarter ends in September (1Q), and so forth.  ¶ 7 n.1.

industry-wide industrial and energy demand was "definitely weak," while describing the market transition to EVs as "happening at a more modest pace than previously anticipated." *See* Ex. 3 at 5, 12. Similarly, in August 2024, Wolfspeed disclosed that "the ramp of EVs is slower than previously projected and many companies in the semiconductor industry are still confronting automotive headwinds." Ex. 5 at 5. At the same time, the Company's EV revenue "was up more than 100% year-over-year" and had "grown for 3 consecutive quarters despite a declining auto semiconductor market." *See id*. at 5–6.

**D.      November 6, 2024 Earnings, This Action, and Chapter 11 Bankruptcy**

By November 2024, customer demand had not continued to materialize on the timeline that Wolfspeed had projected, which the Company attributed to a "push out in anticipated EV demand[.]" Ex. 6 at 6.

Wolfspeed also announced a consolidated quarterly revenue of approximately $195 million, of which the MVF contributed $49 million for FY25Q1, $1 million (just 2%) shy of its projected quarterly range. Ex. 6 at 8–9; Ex. 5 at 8. Wolfspeed primarily attributed the revenue "to lower customer demand." Ex. 6 at 9. As a result, Wolfspeed revised its FY25Q2 revenue guidance for continuing operations to a range of $160 to $200 million, of which the MVF was expected to contribute $50 million to $70 million. *Id.*

On the announcement, Wolfspeed's stock price declined. ¶¶ 15–16. Plaintiffs brought suit in the Northern District of New York soon after, *see* ECF No. 1, challenging statements regarding the MVF's projected utilization rate, achievement of utilization rate

targets, and projected revenue, as well as Wolfspeed's demand in the EV market. *See infra* Section I.

On June 30, 2025, Wolfspeed and its affiliate filed voluntary petitions for bankruptcy under Chapter 11. *See* ECF No. 63. After just three months, Wolfspeed successfully emerged from Chapter 11. *See* ECF No. 66.

On December 22, 2025, the New York court granted Defendants' Motion to Transfer, *see* ECF No. 76, and transferred the Action here on January 7, 2026, *see* ECF No. 77.

## QUESTIONS PRESENTED

1.     Whether Plaintiffs state a claim under § 10(b) of the Exchange Act and Rule 10b-5 where they fail to plead facts establishing that: (a) any challenged statement was false or misleading; or (b) any Defendant acted with intent to deceive or severe recklessness?

2.     Whether Plaintiffs state control person claims under § 20(a) of the Exchange Act where they fail to plead a predicate primary violation?

## ARGUMENT

On a Rule 12(b)(6) motion to dismiss, the Court must credit well-pled facts but need not accept "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft*, *v. Iqbal*, 556 U.S. 662, 678–79 (2009).[4]

---

[4]     Unless otherwise noted, all emphases are added, and citations omit internal citations, quotation marks, and alterations.

Securities fraud claims also are subject to the "heightened pleading requirements" of Rule 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b). *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 240–41 (4th Cir. 2023). "This means that Plaintiffs must establish the who, what, when, where, and how of the alleged fraud that underlies their claims." *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 539 (M.D.N.C. 2013). "Congress recognized the potential for abuse in the securities fraud context, including nuisance filings, targeting of deep-pocket defendants, vexatious discovery request and manipulation by class action lawyers," *id.* at 538, and so that courts are "vigilant in preventing meritless securities fraud claims from reaching the discovery phase of litigation." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008).

To state a claim under § 10(b) and Rule 10b-5(b), Plaintiffs must plead that (1) each Defendant made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which Plaintiffs relied; (5) and suffered an economic loss; and (6) that Plaintiffs' reliance was the proximate cause of the loss. *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021).

The Complaint does not meet these standards because it fails to allege: (1) an actionable misstatement, or (2) a "strong inference" that any Defendant acted with scienter. *Id*.

8

## I. THE COMPLAINT FAILS TO ALLEGE A FALSE OR MISLEADING STATEMENT

Plaintiffs must "specify each statement alleged to have been misleading [and] the reason . . . why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B) The Complaint fails to do so.[5]

Plaintiffs primarily challenge four categories of statements.[6] *First*, statements concerning the pace of the MVF ramp-up and projected utilization rate.[7] *Second*, statements that the MVF had achieved its projected 20% utilization rate in June 2024.[8] *Third*, statements concerning the MVF's projected quarterly revenue of $100 million by December 2024.[9] *Finally*, statements concerning the demand for Wolfspeed's products, including from the EV market.[10]

---

[5] The challenged statements come from five quarterly earnings calls, *see* Ex. 1, Ex. 2, Ex. 3, Ex. 4, Ex. 5, one press release, *see* Ex. 11, and three investor conferences, *see* Ex. 13, Ex. 14, and Ex. 15. To aid the Court's review, Defendants append a chart compiling the challenged statements from the Complaint, which Defendants assume to include only those portions of the statements that are so emphasized. The chart is not included in Defendants' word count because it repeats Plaintiffs' Complaint. *See* Appendix A (Challenged Statement Chart).

[6] The Complaint also quotes from dozens of analyst reports, but these cannot be attributed to Wolfspeed. *See In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 889 (W.D.N.C. 2001) (analyst report attributable only if content "*controlled by the defendant*").

[7] ¶¶ 106–09, 113–14, 130, 133, 135–36, 141, 146, 162, 170, 171, 177–78.

[8] ¶¶ 161, 177.

[9] ¶¶ 109, 133, 136, 172. Notably, Plaintiffs challenge only the projection that the MVF would achieve $100 million in quarterly revenue by December 2024. Wolfspeed met its other MVF projections throughout the Class Period, aside from a modest miss of $1 million at the end of Class Period. *See* ¶¶ 170, 180.

[10] ¶¶ 130, 134, 136, 142–43, 147–50, 154–55, 169, 172. Plaintiffs block quote several paragraphs from Wolfspeed's 10/30/23 earnings call concerning demand, *see* ¶¶ 116–121,

As set out below, Plaintiffs have not alleged with specificity why *any* challenged statement was false or misleading when made. *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 175 (4th Cir. 2007).[11]

### A. Plaintiffs Fail to Allege That Defendants' Statements Were False

The only basis for Plaintiffs' sweeping claims of falsity is the accounts of two purported former Wolfspeed employees, who offer nothing beyond vague and conclusory allegations unsupported by specific facts, personal opinions, and impermissible hearsay. *See* ¶¶ 52–104. Apart from the allegations of these two FEs, Plaintiffs do not point to any contemporaneous documents, non-public statements by the Individual Defendants, or other particularized, non-conclusory facts demonstrating the falsity of any challenged statement.

Former employee allegations "usually have to be particularly detailed, numerous, plausible, or objectively verifiable by the defendant before they will support a reasonable belief that the defendant's statements were false or misleading." *In re Cree, Inc. Sec. Litig.*, 2005 WL 1847004, at *3 (M.D.N.C. Aug. 2, 2005). The Court should closely examine "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.*

---

and block quote a paragraph from Wolfspeed's 8/21/24 earnings call concerning demand, *see* ¶ 173, but do not allege that they are false or misleading.

[11]     To the extent Plaintiffs allege that Wolfspeed "manipulated its quarterly results" or engaged in any internal controls violations, *see* ¶¶ 87–104, Plaintiffs fail to connect those allegations to any challenged statement.

10

Courts routinely determine FEs are unreliable on a motion to dismiss. *See, e.g.*, *Hunter*, 477 F.3d at 179–82; *Primo*, 966 F. Supp. 2d at 544; *Fanucchi v. Enviva Inc.*, 2024 WL 3302564, at *13–14 (D. Md. July 3, 2024); *Leacock v. IonQ, Inc.*, 2023 WL 6308045, at *14 (D. Md. Sep. 28, 2023).

Plaintiffs' FEs fail this test. Plaintiffs identify FE1 as a "Global Cost Accounting Director" who worked at the Company's headquarters from June 2023 to September 2024, ¶¶ 52–53, and FE2 as a "Financial Analyst" who worked at the Company's headquarters beginning in February 2024, ¶ 55. Critically, neither FE was employed at Wolfspeed for the entire Class Period. FE1 left the Company in September 2024—two months before the November earnings announcement that underlies Plaintiffs' allegations. *See* ¶ 52; *see also Leacock*, 2023 WL 6308045, at *14 (finding FE "cannot speak to developments after he departed" company). FE2 did not join the Company until February 2024, over six months *after* the Class Period began, and Plaintiffs fail to specify when FE2 departed the Company. ¶ 55; *see also In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) (rejecting FE allegations where plaintiffs fail to allege when FEs worked at company). The FEs' allegations do not "support a probability that [they] would possess the information" they claim to know. *Leacock*, 2023 WL 6308045, at *14; *see also Gross v. AT&T*, 2021 WL 9803956, at *6 n.14 (S.D.N.Y. Sep. 27, 2021).

The substance of the FEs' allegations is similarly deficient.

11

### 1. The Pace of the MVF Ramp-Up and Projected Utilization Rate

The FEs' allegations regarding the pace of the MVF ramp-up and projected utilization rate are patently insufficient. FE1 states vaguely that Wolfspeed was "slower to get MVF up and running," that the Company "wasn't getting to the level of volume quickly enough," and that "[y]ou've got to get [manufacturing] up fast and run it fast . . . if you don't, that can cripple you quickly, financially speaking." ¶ 57. FE1 claims he participated in monthly P&L reviews, which "included information about MVF's utilization because *if* the facility was not hitting the planned utilization, Wolfspeed would need to carry a variance, which FE1 had to apply." ¶ 54. But FE1 provides no specifics about any actual shortfalls in planned utilization (*e.g.*, at what point in time or by how much). Indeed, he never claims he *applied* a "variance," much less when he did so or the size of the variance. *See Primo*, 966 F. Supp. 2d at 547 (discrediting FE allegation that lacked specific supporting facts).

FE1 also alleges that he and "others on the Finance side were asking questions and seeing that the P&L doesn't look like where we're forecasted," that his participation in these so-called "margin reviews" revealed that "we weren't hitting 20% absorption," and that "absorption rate and utilization rate were one and the same." ¶ 58–59. The assertion that the P&L "[didn't] look like" the forecast is completely devoid of specifics about dates or quantification. *See Hunter*, 477 F.3d at 181–82. Moreover, FE1 never explains what a "margin review" is, when the reviews occurred, how details about an "absorption rate" would have demonstrated that the Company was not on pace to hit its utilization targets,

or by how much the MVF generally was not "hitting" the absorption rate at any given time. *See In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 670 (D. Md. 2018) ("[A] plaintiff must identify with some precision the date, place and time of active misrepresentations or the circumstances of active concealments.").

FE2's allegations regarding the pace of the MVF ramp-up are similarly deficient. FE2 states only that it was "clear to him" on joining the Company in February 2024 that the "MVF was not hitting its targets," and speculates that "[i]t just seemed we were supposed to be at a certain level, and we weren't at that level. That's how I saw it and how it was conveyed to me." ¶ 57. FE2's vague "speculation and opinion" cannot demonstrate the falsity of the challenged statements. *See In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 573 (W.D. Va. 2006). FE2 also alleges that it was "open knowledge" within the Company and that he had unspecified "conversations" with unidentified people about "the fact that MVF was not where it should have been." ¶ 57. These assertions are devoid of specifics about by how much the MVF was missing its targets or when, and vague reports of conversations at unspecified times with unspecified people come nowhere close to satisfying the PSLRA. *See Hunter*, 477 F.3d at 181 (FE allegation that information was "well-known" within company insufficient where complaint does not tie that sentiment to particular date or individuals); *Fanucchi*, 2024 WL 3302564, at *14 (similar); *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 640 (D. Md. 2012) ("Hearsay allegations and bald assertions made by confidential witnesses will not defeat a Rule 12(b)(6) motion.").

13

### 2. Wolfspeed's Achievement of 20% Utilization Rate by June 2024

The FEs' allegations that Wolfspeed misrepresented that the MVF had reached its projected 20% utilization rate in June 2024 fare no better. FE1 states only that he "never saw anything with that 20% on it," that when he departed the Company in September 2024, the MVF's utilization rate was "only at like 10%," and that "there was a lot of pressure on the local team in New York about not hitting the 20% utilization rate." ¶ 60. While FE1 may not have *personally* seen "anything with that 20% on it," he does not allege that he saw anything with 10% on it and otherwise provides no basis for that figure. ¶¶ 57–61. FE1's vague descriptions of "pressure" and guesstimate about utilization rate fall short of the PSLRA's particularity requirement. *See Hunter*, 477 F.3d 181 (discounting FE regarding valuation of business when plaintiffs do not allege how FE would know such information or have expertise in deriving it); *see also Primo*, 966 F. Supp. 2d at 547 (dismissing allegations that customers were dissatisfied with company's products as vague and conclusory where FE failed to identify existence of any dissatisfied customers).

FE2's allegations are dead-on-arrival. FE2 fatally admits that "*he did not remember exactly where MVF was in reaching 20% utilization during his tenure at Wolfspeed*" and that "all [he] can say is they weren't where they needed to be, and that that was a big issue." ¶ 57. *See Hunter*, 477 F.3d at 179–80. Otherwise, FE2's assertion is just his own opinion, with no supplied factual basis at all. *See supra* Section I.A.1. None of this demonstrates that Wolfspeed misrepresented its achievement of the 20% utilization milestone.

14

### 3. Wolfspeed's Projected MVF Revenue

FE1 states that "the pressure to meet certain numbers at Wolfspeed was beyond anything I'd experienced." ¶¶ 87–88; *see also* ¶¶ 97, 99–100. He also makes general assertions about the purported responses of unidentified individuals to the "rollups" during the end of quarter budgeting and financial review process, ¶¶ 98–102, which supposedly indicated the "pressure" put on the Finance team to reach certain financial targets. ¶¶ 99, 101, 103–04.

As an initial matter, none of this connects to the challenged statements. "Pressure" to *meet* prior revenue projections in connection with preparation of financials *at the end of the quarter* says nothing about whether the projections themselves (made months earlier) were reasonable when made. Indeed, despite his colorful rhetoric (*e.g.*, the review process was "right on the line of being unethical"), *see* ¶ 103, FE1 never claims that any reported revenue number was falsified to match prior projections, and the Complaint stops well short of alleging that. *Hunter*, 477 F.3d at 181 (FE allegation that company was "very aggressive" in cutting deals and would "move the line" when necessary was insufficient).

FE1 also asserts that "Wolfspeed's projected revenue outlook and anticipated growth was unrealistic" based on his "direct conversations" with unnamed "Sales financial analysts and controllers." ¶ 65.[12] Vague assertions premised on hearsay from unidentified

---

[12] FE1 similarly makes the conclusory assertion that "[management's] expectation around the volume didn't match with reality," which was that "over the last two years the EV market has changed drastically." ¶ 66 (brackets in original). This assertion is similarly devoid of specifics. *Supra* Section I.A.1.

15

persons do not even come close to satisfying the pleading standard. *See In re Trex*, 454 F. Supp. 2d at 573 ("Because the confidential witness must have personal knowledge, the testimony cannot be based on hearsay.").

FE2's sole assertion regarding revenue is his conclusion that it was "without a doubt true that Wolfspeed's projected revenue outlook and anticipated growth was overly optimistic." ¶ 62. This fails to demonstrate with particularity that any projection was false or misleading when made. *See in re Trex, 454 F. Supp. 2d at* 569–70, 573 (W.D. Va. 2006) (FE allegations insufficient when based on "speculation and opinion"). And although FE2 claims he knew about the Company's revenue based on "what I saw coming in when looking at the Company's P&L statements, including actual performance versus forecast," FE2 never specifies what numbers he saw, when he saw them, or how they rendered any revenue projection misleading when issued. ¶ 64; *see supra* Section I.A.1.

### 4. The Demand for Wolfspeed's Products

Finally, the FEs' allegations regarding demand for Wolfspeed's products suffer from two fundamental flaws. They do not engage with what Wolfspeed actually said about demand, and they offer no particulars as to timing or other specifics that are contrary to any of the challenged statements.

FE1 offers conclusory assertions regarding a purportedly "quick decline from a demand perspective" and a "pressure"-filled budget process. ¶ 68. For example, FE1 states that as of January and February 2024, "there were a lot of concerns around softening

16

demand" during the "budgeting process" and that by "February or March 2024 . . . there were a lot of concerns around cost pressure." ¶¶ 67–68; *see also* ¶ 69.

But these general assertions about "pressure" and "concerns" do not show why any specific challenged statement about demand during the Class Period was false when made. *See Hunter*, 477 F.3d at 181. FE1's further assertions about declining demand from June 2024 through "toward summer 2024," *see* ¶¶ 69, 85, do not connect to any challenged statement, as Plaintiffs do not challenge *any* demand-related statements from June 2024 through the end of the Class Period and, in any event, FE1's allegations suffer from the same lack of specificity that plagues his other allegations. *See supra* Section I.A.1.

FE2's demand-related assertions offer mostly conclusions and hyperbolic accusations that lack the requisite specificity. For example, he claims that as of February 2024, "[t]he volume or the demand just fell off a cliff," that "customers were falling off the face of the planet," and that "it was pretty ridiculous." ¶ 63.[13] FE2's other allegations are nothing more than his gripes with the Company. *See, e.g.*, ¶ 63 (noting that FE2 felt "pretty misguided because during [his] job interviews, [FE2] was told that there was so much demand"). Courts routinely find these types of allegations insufficient. *Supra* Section I.A.1. Finally, FE2 claims that "weekly reports" he sent to the "Vice-President level of the Company" showed "declining demand," but offers no specifics as to the content of any

---

[13] *See also* ¶ 64 ("If you can imagine a car driving off a cliff crashing into a ravine, that's basically what happened."), ¶ 77 (referencing "crazy demand schedule that I never thought – there was no way they were going to achieve it").

17

report that showed a contemporaneous statement was false or misleading. ¶ 76; *see Phillips v. Triad Guar. Inc.*, 2015 WL 1457980, at *6 (M.D.N.C. Mar. 30, 2015) (discounting FE allegation failing to allege at which meetings contradictory information was purportedly discussed); *Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*, 2013 WL 1192004, at *11 (E.D.N.C. Mar. 22, 2013).[14]

### B. Many of the Challenged Statements Are Inactionable Because They Are Forward-Looking, Puffery, or Opinion

#### 1. Many Challenged Statements Are Protected by the PSLRA Safe Harbor

The PSLRA safe harbor applies to a forward-looking statement if it is "identified . . . and accompanied by meaningful cautionary statements . . . *or* if the plaintiff fails to prove that it was made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c); *see also Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 389 (4th Cir. 2023). The challenged statements at issue here are protected under both prongs.

---

[14] FE2 recites many of the same market-wide factors impacting demand that Wolfspeed itself acknowledged, c*ompare, e.g.*, ¶ 71 *with* ¶ 116 and ¶ 142, but does not challenge Wolfspeed's explanation for why it was positioned to avoid them. Similarly, FE2's assertions regarding costs, pricing, inventory, and other business matters do not connect to any statement concerning demand. *See* ¶¶ 78–86; *In re Trex*, 454 F. Supp. 2d at 580 (no falsity where plaintiffs failed to show that company "did not have a growing demand for its products" or leading market share).

18

### a. Many of the Challenged Statements Are Forward-Looking and Identified as Such

The PSLRA defines "forward-looking statement" to include "a statement containing a projection of revenues," "a statement of the plans and objectives of management for future operations, including [for] the products or services of the issuer," and "any statement of the assumptions underlying" such statements. 15 U.S.C. §§ 78u-5(i)(1)(A), (B), and (D); *see also Primo*, 966 F. Supp. 2d at 550 (statements that company "expects total sales . . . to double" is forward-looking); *In re Humphrey Hosp. Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 683 (D. Md. 2002) (similar).

Statements concerning the MVF's ramp-up and projected utilization are forward-looking. *See, e.g.*, ¶ 106 ("[W]e are still aligned on previous *expectations that we will reach* 20% utilization out of [the MVF] by the end of fiscal 2024[.]"); ¶ 108 ("In terms of the ramp of the production . . . [o]ur *expectation* is that we'll be at 20% utilization by the June quarter."); ¶ 170 ("[W]e *expect* to be able to support a 25% wafer start utilization at [the MVF] in the September quarter . . . we are also now *expecting* . . . 30% wafer start utilization at [the MVF] in the March quarter of 2025.").[15] *See MacroGenics*, 61 F.4th at 389 (statement that company "anticipate[s] the preliminary positive trend . . . to continue" is forward-looking).

Statements concerning the MVF's projected revenue are similarly forward-looking. *See* ¶ 106 ("[I]t will be the second half of the calendar year 2024 before we see $100 million

---

[15]     *See also* ¶¶ 109, 113–14, 120–21, 130, 133, 135–36, 146, 162, 170, 172.

of quarterly revenue from the fab that the 20% utilization would represent."); ¶ 133 ("[W]e're going to keep the pace of the fab itself at . . . $100 million of revenue in the December quarter.");[16] *Primo*, 966 F. Supp. 2d at 556 (statements "containing a projection of revenues" are forward-looking); *Elec. Workers Pension Tr. Fund of IBEW Loc. Union No. 58 v. CommScope, Inc.*, 2013 WL 4014978, *9–10 (W.D.N.C. Aug. 6, 2013) (statements of revenue guidance and anticipated earnings are forward-looking).

Moreover, the press release and earnings calls in which these statements were made all explained that forward-looking statements were being made.[17] The earnings calls also incorporate by reference the corresponding press releases.[18] Beginning with Wolfspeed's earnings press release for FY24Q1, on October 30, 2023, Wolfspeed specifically defined forward-looking statements to include statements concerning "our ability to meet targeted utilization rates at the [MVF]." Ex. 8 at 3.[19]

---

[16]    *See also* ¶¶ 136, 170.

[17]    *See* Ex. 7 at 3 ("This press release contains forward-looking statements . . ."); Ex. 1 at 4 ("Today's discussion includes forward-looking statements about our business outlook, and we may make other forward-looking statements during the call."); Ex. 2 at 4 (same); Ex. 3 at 4 (same); Ex. 4 at 4 (same); Ex. 5 at 4 (same).

[18]    *See* Ex. 1 at 4 ("[F]orward-looking statements are subject to numerous risks and uncertainties. *Our press release today* . . . mention[s] important factors that could cause actual results to differ materially."); Ex. 2 at 4 (same); Ex. 3 at 4 (same); Ex. 4 at 4 (same); Ex. 5 at 4 (same).

[19]    *See also* Ex. 9 at 3 (same); Ex. 10 at 3 (same); Ex. 11 at 2 (similar); Ex. 12 at 3 (similar).

**b.    *The Challenged Statements Were Accompanied by Meaningful Cautionary Language***

The press release and earnings calls[20] in which the forward-looking challenged statements were made, and the SEC filings incorporated by reference,[21] include robust risk disclosures.  *See Primo*, 966 F. Supp. 2d at 550 ("SEC filings incorporated by reference are sufficient to invoke the safe harbor.").  These disclosures warned of the "factors that realistically could cause results to differ materially from those projected in the forward-looking statements" and alerted investors to the "significant risks similar to that actually realized."  *Chapman v. Fennec Pharms. Inc.*, 2021 WL 7209981, at *7–8 (M.D.N.C. Dec. 16, 2021); *see also MacroGenics*, 61 F.4th at 390 (similar).[22]

Wolfspeed's cautionary language did precisely that.  The press releases and annual reports (incorporated by reference) specifically warned of the following, among other risks:

---

[20]     *See supra* n.17.

[21]     Ex. 7 at 3 (referencing "*report on Form 10-K* for the fiscal year ended [6/26/22], and subsequent reports filed with the SEC"); Ex. 1 at 4 ("Our *press release today and the SEC filings noted in the release* mention important risk factors that could cause actual results to differ materially."); Ex. 2 at 4 (same); Ex. 3 at 4 (same); Ex. 4 at 4 (same); Ex. 5 at 4 (same); *see also* Ex. 8 at 3 (referencing "*report on Form 10-K* for the fiscal year ended [6/25/23], and subsequent reports filed with the SEC"); Ex. 9 at 3 (same); Ex. 10 at 3 (same); Ex. 11 at 3 (same); Ex. 12 at 4 (same); Ex. 16 at 13–14, 16, 18, 28; Ex. 17 at 13–14, 16–18, 30.

[22]     In order to be meaningful, cautionary language need not warn of the exact risk that materialized.  *See In re Lab'y Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428, at *4–5 (M.D.N.C. May 18, 2006) (finding even "standard" cautionary language satisfies PSLRA requirements when it puts potential investors on notice of "significant risks similar to that actually realized").

- "risks associated with our expansion plans, including . . . issues in installing and qualifying new equipment and ramping production";[23]

- "the risk that our results will suffer if we are unable to balance fluctuations in customer demand and capacity";[24]

- the risk that Wolfspeed is not "able to accurately anticipate demand from end customers, which can result in increased inventory and reduced orders as we experience wide fluctuations in supply and demand";[25]

- risks related to Wolfspeed's "ability to meet targeted utilization rates" at the MVF;[26]

- "the risk that the markets for our products will not develop as we expect, *including the adoption of our products by electrical vehicle manufacturers and the overall adoption of electrical vehicles*";[27]

- that Wolfspeed "opened a new [SiC] device fabrication facility [the MVF]" and that "[t]he establishment and operation of a new manufacturing facility or expansion of an existing facility involves significant risks and challenges . . . including, but not limited to . . . issues in installing and qualifying new equipment and ramping production";[28]

- that Wolfspeed "operate[s] in industries that are subject to significant fluctuation in supply and demand . . . which affects our revenue and profitability" and that a "number of industry factors" could affect its "potential for growth," including overall demand for products;[29] and

---

[23]  Ex. 7 at 3; Ex. 8 at 3; Ex. 9 at 3; Ex. 10 at 3; Ex. 11 at 2 (similar); Ex. 12 at 3.

[24]  *Supra* n.23.

[25]  *Supra* n.23.

[26]  Ex. 8 at 3; Ex. 9 at 3; Ex. 10 at 3; Ex. 11 at 2 (similar); Ex. 12 at 3.

[27]  Ex. 9 at 3; Ex. 10 at 3; Ex. 12 at 3.  Wolfspeed began including this disclosure in its filings in January 2024—precisely when Plaintiffs allege EV demand began to decline. *See* ¶¶ 67, 73.

[28]  Ex. 16 at 13; Ex. 17 at 13; *see also* Ex. 16 at 14 (similar); Ex. 17 at 13–14 (similar).

[29]  Ex. 16 at 16, 28; Ex. 17 at 16, 30.

- Wolfspeed might not be able to "accurately anticipate demand from end customers, which can result in increased inventory and reduced orders if we experience wide fluctuations in supply and demand."[30]

Where, as here, the accompanying cautionary language is "sufficient to invoke the protections of the [s]afe [h]arbor," the forward-looking statements are non-actionable. *Chapman*, 2021 WL 7209981, at *8.

### c. *Plaintiffs Fail to Plead Actual Knowledge of Falsity*

In addition, the safe harbor protects Defendants' forward-looking statements because Plaintiffs fail to plead that Defendants had "actual knowledge" that the statements were false when made. 15 U.S.C. § 78u-5(c)(1)(B)(i); *see MacroGenics*, 61 F.4th at 389. Plaintiffs fail to do so. *See infra* Section II; *TransEnterix Inv. Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 753, 758 (E.D.N.C. 2017) (no actual knowledge where scienter not pled).

---

[30] Ex. 16 at 18; Ex. 17 at 17–18.

## 2. Many Challenged Statements Are Non-Actionable Corporate Optimism and Opinions

Many of the challenged statements regarding the MVF's ramp-up and projected utilization rate,[31] the MVF's projected revenue,[32] and Wolfspeed's demand,[33] are also general statements of "corporate optimism" or "puffery." *MacroGenics*, 61 F.4th at 386. The expressions "great shape," "on track," and "robust" are "textbook examples of puffing statements." *Id.* at 386; *see also Oklahoma Firefighters Pension & Ret. Sys. v. K12, Inc.*, 66 F. Supp. 3d 711, 722 (E.D. Va. 2014) (finding inactionable statement that company was "*on track* to have one of the best business development years in [its] history"); *Chapman*, 2021 WL 7209981, at *10, *13 ("we also made solid progress," "we continue to make progress," and "significant milestone"); *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 42 (D. Mass. 2016) (company's core business is "robust," "we believe in the continued growth

---

[31]     *See* ¶ 113 (MVF ramp-up is "*in really great shape*" and "*on track*"), ¶ 114 (Defendants are "*extremely confident*" in Wolfspeed's "ability to achieve 20% utilization in the fab by June [2024]" and progress is "*on target*"), and ¶ 130 (Defendants are "*confident* about [Wolfspeed's] execution of our near-term operational goals and optimistic around our long-term financial prospects"); *see also* ¶¶ 133, 135–36, 141, 146, 161, 171, 178.

[32]     *See* ¶ 133 ("[W]e're going to keep the pace of the fab itself at . . . $100 million of revenue in the December quarter. *We feel real good about that*").

[33]     *See* ¶ 116 ("We remain confident that the demand from automotive customers will remain strong"); ¶ 130 (Wolfspeed's achievements in design-ins "*clearly indicates* continuing and growing *robust* demand for [SiC]," "diverse customer base across the global electric vehicle industry . . . gives us *confidence* to continue with our expansion plan and further illustrates *why we believe* our supply will be continuing to work to catch up with demand over the next few years," and Wolfspeed has "*good visibility* into how the markets are evolving"); ¶ 136 ("*[W]e feel like*, obviously, the demand continues to remain strong[.]"); ¶ 142 ("we still have a demand scenario that is *substantially higher* than our supply[.]"); *see also* ¶¶ 134, 142–43, 147, 149–50, 154–55, 169.

24

potential of the product," and "we think we can execute to continue growth"); *Pollio v. MF Glob., Ltd.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) ( "we are extremely pleased that our volumes and revenues have remained strong" and "our customers continue to seek [our] services").

Many of Defendants' optimistic statements about the MVF's ramp-up and projected utilization rate,[34] the MVF's projected revenue,[35] and Wolfspeed's demand[36] are also non-actionable opinions. *See Boykin v. K12, Inc.*, 54 F.4th 175, 184 (4th Cir. 2022) (company "believe[s it has] attained distinctive core competencies"); *In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *6, *15 (E.D. Va. June 2, 2020) (company "continue[s] to build momentum"); *In re Indivior PLC Sec. Litig.*, 2025 WL 2242758, at *10 (E.D. Va. Aug. 6, 2025) (defendants "anticipate an acceleration in [] growth"). Unless Plaintiffs allege with particularity that Defendants did not subjectively believe the opinion, that self-embedded facts within the opinion were untrue, or that contrary material facts related to Defendants' inquiry into or knowledge concerning the opinion were omitted, opinions are inactionable as a matter of law. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184–89 (2015). Plaintiffs only challenge the first prong of the *Omnicare* standard and as discussed, offer no such specific allegations to demonstrate that Defendants did not subjectively believe their opinions. *See supra* Section I.A.

---

[34]  *See supra* n.31.

[35]  *See supra* n.32.

[36]  *See supra* n.33.

25

## II. THE COMPLAINT FAILS TO RAISE A STRONG INFERENCE OF SCIENTER

Plaintiffs' § 10(b) claim also fails to plead "with particularity" facts giving rise to a "strong inference" of scienter. 15 U.S.C. §§ 78u-4(b)(2), (b)(3). To qualify as "strong," an inference of scienter "must be more than merely plausible or reasonable." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309 (2007). It "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. If "the more compelling inference is that the defendants acted innocently—or even negligently—[the court] must" dismiss the Complaint. *Advance Auto Parts*, 2026 WL 438677, at *4.

To meet this high burden, Plaintiffs must allege that Defendants "acted with a mental state embracing intent to deceive, manipulate, or defraud." *Id.* (citing *Tellabs*, 551 U.S. at 319). Recklessness will suffice only where Plaintiffs demonstrate that Defendants exhibited "intentional or severely reckless conduct." *KBC*, 19 F.4th at 608. "Recklessness is an act so highly unreasonable and such an extreme departure from the standard of ordinary care" as to present a known or obvious danger of misleading the plaintiff. *Id*.; *see also Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014).[37] Plaintiffs' allegations fall well short. Even when taken together, the "more compelling inference" is that Defendants were optimistic about the Company's ability to meet aggressive financial goals and weather a market downturn, and then reduced those estimates as soon as it became apparent the Company could not meet them. *See supra* pp. 3–7.

---

[37] In the corporate context, pleading scienter requires allegations establishing scienter as to at least one Individual Defendant. *Yates*, 744 F.3d at 885.

26

### A. Plaintiffs Fail to Plead Motive

While Plaintiffs are not required to plead motive, failing to do so "weighs heavily against" plaintiffs in any scienter analysis. *Syneos*, 75 F.4th at 242. When plaintiffs fail to plead motive, their circumstantial evidence of fraud must be "correspondingly greater." *Id*.

The only explicit mention of a "motive" is a passing reference to Defendants' purported desire to reduce the amount of unrestricted cash the Company had to hold according to its debt instruments, which was allegedly tied to the MVF's ability to achieve its utilization targets. *See* ¶¶ 252–55. But this kind of generalized, corporate motive—as opposed to a concrete, personal motive[38]—is insufficient. *See Yates*, 744 F.3d at 891 (declining to infer fraud from "financial motivations common to every company," including "artificially inflat[ing] the price of its shares to attract investors, fund[ing] corporate acquisitions, avoid[ing] a default on loan covenants, and obtain[ing] favorable loan terms"); *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003) (similar as to maintaining positive relationships with creditors or avoiding additional interest payments).[39]

---

[38] For example, a plaintiff in a securities fraud case might plead motive by alleging suspicious stock sales by the individual defendants. *See, e.g.*, *Yates*, 744 F.3d at 890. Plaintiffs make no such allegation.

[39] To the extent that Plaintiffs allege that "higher-paid finance employees received their bonuses based on the Company meeting certain targets," ¶ 88, these allegations are similarly nothing more than insufficient generalized corporate motives. *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("[C]orporate executives are

27

### B. The FEs' Allegations Do Not Plead the Scienter of the Individual Defendants

Plaintiffs' primary basis for pleading scienter rests on the FEs' accounts. FE allegations used to support scienter "will only be afforded the weight they are due given their indicia of reliability." *Advance Auto Parts*, 2026 WL 438677, at *6. Here, neither FE alleges *any* direct communications with, that they reported to, or even that they participated in any meetings with, either of the Individual Defendants. *See* ¶¶ 52–104, 202–13. This failure is dispositive. Where there is no "indication that the [anonymous] employee passed their concerns on to the individual defendants or that the individual defendants were otherwise aware of the problems alleged" little weight will be given to the anonymous sources. *Advance Auto Parts*, 2026 WL 438677, at *7; *KBC*, 19 F.4th at 609 ("[L]ack of direct contact with Defendants weakens the inference of scienter[.]"). And Plaintiffs otherwise do not plead any particularized facts showing that the information allegedly rendering the challenged statements false was so obvious that Defendants must have known it. *Syneos*, 75 F.4th at 241.[40]

FE1 vaguely asserts that he "would have assumed" that Lowe and Reynolds received P&L reviews that purportedly contained contrary information regarding MVF

---

generally motivated to maximize bonus compensation. These allegations do not support an inference of scienter.").

[40] Both FEs aver that certain matters were "well known" within the Company, but those allegations are insufficient. *See, e.g.*, ¶ 58 ("by the time we got to the point of the margin review, everyone knew that we weren't hitting the number"), 73, 75; *Hunter*, 477 F.3d at 181.

utilization. *See* ¶ 204. This is insufficient to show that they received the reviews, much less what was in the reports that would have alerted them to the falsity of their statements. *See Pipefitters*, 2013 WL 1192004, at *12; *see also In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015); *In re Metawave, Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1080 (W.D. Wash. 2003) (no inference of scienter where FE alleged defendants received monthly reports but failed to allege contents).

Plaintiffs' scienter allegations for the demand statements fare no better. FE1's supposed "understanding" that the Company's "final rollup" budget that purportedly demonstrated demand was falling "would go to Lowe and Reynolds," and his assumption "there were other conversations going on with Lowe and Reynolds" as part of the "rollup budget" process, are insufficient. *See* ¶ 69, 85; *Yates*, 744 F.3d at 887 (no scienter where FE allegations are "vague and conclusory" as to "defendants' state of mind"); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 145 (D. Md. 2021) (finding scienter allegations insufficient where FEs only speculate about what defendants "may have known"). For the same reasons, FE2's sole assertion that weekly reports that purportedly "reflected the declining demand" were "definitely sent to the chain of employees *underneath* Lowe and Reynolds," ¶ 76, also fails—that says nothing about the specific content of any report relative to any challenged statement or whether the Individual Defendants themselves received those reports. *See Advance Auto Parts*, 2026 WL 438677, at *7 (employee's "mere belief that the rest of the [non-defendant] senior management team knew about the issue is too speculative to support scienter").

29

### C. Plaintiffs' Fallback Theories of Scienter Fail

Given their failure to allege scienter through the FEs' allegations, Plaintiffs fall back on shopworn theories that seek to suggest scienter without actual facts, none of which satisfies the PSLRA. *Maguire Financial, LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017) ("A plaintiff may not stack inference upon inference to satisfy the PSLRA's pleading standard.").

#### 1. Defendants' Access to Information Does Not Support Scienter

Plaintiffs claim that because the Individual Defendants "had access to information concerning MVF utilization and EV demand," "it would be illogical to assume that [they] were unaware that their statements were false and misleading." ¶ 202. Allegations that amount to "scienter-by-status" are insufficient. *See Syneos*, 75 F.4th at 242 ("[W]e cannot impute factual knowledge to individuals merely based on their professional position."); *Maguire*, 876 F.3d at 547–48 (similar); *Yates*, 744 F.3d at 890 (4th Cir. 2014) (similar). Besides, Plaintiffs do not specify what contrary information the Individual Defendants had, or when they had it, relative to any challenged statement. *See supra* Section I.A.

#### 2. The "Critical Importance of the MVF Ramp and the Company's Supply to Meet Demand" and Defendants' Statements and Responses to Analysts Do Not Support Scienter

Plaintiffs allege that because the MVF and demand were so important to the Company, and because the Individual Defendants made statements throughout the Class Period indicating that they were "keeping informed" about the MVF utilization and the Company's demand and were "laser-focused" on the MVF ramp, they must have known

that the statements made to investors on those topics were false or misleading. *See* ¶¶ 190–201; *see also* ¶ 121 (quoting Lowe saying "I am personally *laser-focused* on the [MVF] ramp to 20% utilization in the June quarter."). Plaintiffs' claim about the "importance" of the MVF ramp and demand is an attempt to invoke the "core operations theory," which the Fourth Circuit has repeatedly rejected, holding that "bare allegations that officers have knowledge of key facts . . . because such knowledge relates to the business's core operations are not enough, standing alone, to support a strong inference of scienter." *Yates*, 744 F.3d at 890; *KBC*, 19 F.4th at 612; *see also Maguire*, 876 F.3d at 547–48.

Similarly, that the Individual Defendants indicated that they kept themselves informed about and were "laser-focused" on the MVF and demand says nothing about whether they possessed specific information that contradicted their public statements, and courts have declined to find scienter in identical scenarios. *See Advanced Auto Parts*, 2026 WL 438677, at *5 (finding no scienter for allegations that defendants were "*laser-focused*" on issue where plaintiffs have not "connected that focus to a knowledge" that the statements were false or misleading); *Syneos*, 75 F.4th at 242–43 (similar). If Plaintiffs' logic is accepted, top executives would automatically have scienter in almost every circumstance.

### 3. Lowe's "Admitted" Frustration with Low Stock Price Does Not Support Scienter

Lowe's statements asserting that the price of Wolfspeed stock "should be higher" do not support a strong inference of scienter. ¶¶ 214–18. The allegation makes no sense. The entire premise of the Complaint is that Lowe (and the other Defendants) artificially

31

*inflated* the Company's stock price by making allegedly false or misleading statements, and therefore *knew the stock price was too high*. Alternatively, if Plaintiffs mean to allege that Lowe was motivated to raise the stock price by inflating it, this kind of generalized, corporate motive is insufficient. *See supra* Section II.A. Plaintiffs fail to plead any personal benefit to Lowe, such as stock sales.

### 4. The Timing of the Company's "Purported Operational Turnaround" Does Not Support Scienter

Plaintiffs allege that a "sudden and inexplicable apparent reversal of the operations of the MVF ramp" supports scienter. ¶ 231. Plaintiffs appear to allege that because the MVF ramp had experienced delays before the start of the Class Period, the MVF's increased ramp-up and achievement of its projected 20% utilization target by June 2024 is "suspicious." ¶¶ 219–31. But as the Complaint acknowledges, this so-called "turnaround" was not "sudden and inexplicable"—*it took place over at least 14 months*. *Compare, e.g.*, ¶ 42 (acknowledging that in April 2023, pre-Class Period, Lowe stated "the supply issue had been resolved and that MVF would achieve 20% capacity utilization by [June 2024]") *with* ¶ 161 (acknowledging that in June 2024, Wolfspeed announced it had achieved its 20% utilization target at the MVF). In analogous cases, courts have declined to infer scienter simply because of the temporal proximity between a challenged statement and a disclosure of contrary information. *See KBC*, 19 F.4th at 613 (timing argument "amounts to little more than pleading fraud by hindsight.").

32

### 5. Defendants' "Assertions that EV Demand for Wolfspeed's Products was Increasing When End-Market Demand was Decreasing" Does Not Support Scienter

Plaintiffs' allegations regarding Defendants' "suspicious" assertions that the EV demand was increasing when end-market demand was decreasing do not support an inference of scienter. *See* ¶¶ 232–45. This just begs the question whether the statements about Wolfspeed being positioned to mitigate the effects of lowered market demand, *see, e.g.*, ¶¶ 117, 142, 143, 147, were false in the first place, and whether Defendants knew contrary facts. There is nothing *inherently* suspicious about a company being insulated from market trends. Plaintiffs have not shown this. *Supra* pp. 3–7.

### 6. Lowe's Departure Does Not Establish Scienter

Plaintiffs allege that Lowe's "suspiciously timed firing" from the Company supports a strong inference of scienter. ¶¶ 246–51. Even accepting as true Plaintiffs' allegation that Lowe was "fired," it is well-established in the Fourth Circuit that executive departures, without more, do not support a strong inference of scienter. *See Advance Auto Parts*, 2026 WL 438677, at *7 (no scienter where plaintiffs failed to "bolster the [executive] departures with allegations demonstrating defendants' contemporaneous knowledge" that statements were false); *In re Triangle Capital Corp. Sec. Litig.*, 988 F.3d 743, 753–54 (4th Cir. 2021) (same).[41]

---

[41] Plaintiffs use the word "scheme" throughout the Complaint, *see, e.g.*, ¶¶ 256, 275, 289, but make no attempt to plead a claim for scheme liability. *See SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) (scheme liability requires "an inherently deceptive act that is distinct from an alleged misstatement").

33

## III. PLAINTIFFS' SECTION 20(A) CLAIM FAILS

Because Plaintiffs have failed to plead a primary violation, their § 20(a) "control person" claim fails as well. *Yates*, 744 F.3d at 894 n.8; *Primo*, 966 F. Supp. 2d at 552.

## CONCLUSION

The Court should dismiss the Complaint with prejudice.

Dated: February 20, 2026     Respectfully submitted,

          */s/ Michael G. Bongiorno*

          **WILMER CUTLER PICKERING HALE AND DORR LLP**

          Michael G. Bongiorno*
          Tamar Kaplan-Marans*
          Nicole E. Prunetti*
          7 World Trade Center
          250 Greenwich Street
          New York, NY  10007
          Tel: (212) 230-8800
          michael.bongiorno@wilmerhale.com
          tamar.kaplan-marans@wilmerhale.com
          nicole.prunetti@wilmerhale.com

          Matthew T. Martens (NC Bar No. 31665)
          1875 Pennsylvania Avenue NW
          Washington DC  20006
          Tel: (202) 663-6000
          matthew.martens@wilmerhale.com

          *Notice of Special Appearance filed pursuant to L.R. 83.1(d)

34

*Counsel for Defendants*

*/s/ Rebecca K. Lindahl*

**KATTEN MUCHIN ROSENMAN LLP**

Rebecca K. Lindahl (NC Bar No. 35378)
Michaela C. Holcombe (NC Bar No. 50780)
615 S College Street Suite 1700
Charlotte, NC  28202
Tel: (704) 444-2000
rebecca.lindahl@katten.com
michaela.holcombe@katten.com

*Local Counsel for Defendants*

35

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 7.3(d)(1)</u>

Pursuant to Local Rule 7.3(d)(1) of the Rules of Practice and Procedure of the United States District Court for the Middle District of North Carolina, counsel for Defendants certify that the foregoing brief, which was prepared using Times New Roman 13-point proportional font, is 8,995 words.

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 20, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno

36