UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

No. 1:26-cv-00018-LAF-LPA

| | | |
|---|---|---|
| GARY ZAGAMI, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | **ORAL ARGUMENT REQUESTED** |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| WOLFSPEED, INC., GREGG A. LOWE, and NEILL P. REYNOLDS, | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND ...................................................................... 3

    A.    Wolfspeed's Success Revolved Around MVF ................................. 3

    B.    Defendants Told Investors that MVF Was on Track to Reach the Critical 20% Utilization Milestone ................................................. 4

    C.    Defendants Told Investors that Demand Exceeded Supply .......................... 5

    D.    Defendants Knew MVF Was Not Hitting Utilization Targets and Demand Was Collapsing ........................................................ 6

        1.    Internal Reporting Showed MVF Operating Far Below the Utilization Levels Defendants Claimed ............................. 6

        2.    Internal Reporting Showed Demand for Wolfspeed's Products Was Weakening ................................................. 8

    E.    Even as the Truth Began to Emerge, Defendants Doubled Down .............. 11

III.   ARGUMENT ..................................................................................... 13

    A.    The Complaint Adequately Alleges Material Misstatements and Omissions, and the FE Allegations Should Be Credited .......................... 14

        1.    Statements Asserting MVF Achieved 15%-20% Utilization ........... 15

            a.    The FEs Are Adequately Pled ............................... 15

        2.    Statements Concerning Demand for Wolfspeed's Products ............ 18

        3.    Statements About the Pace of the MVF Ramp, Projected Utilization Rate, and Projected Revenue ........................................ 20

            a.    The FEs' Allegations Are Sufficiently Detailed ................... 21

            b.    The Safe Harbor Does Not Apply ......................................... 22

            c.    The Alleged Misstatements Are Not Puffery ........................ 23

            d.    Defendants' Opinion Statements Are Actionable ................ 24

B. The Allegations Raise a Strong Inference of Scienter .................................. 25

    1. Defendants Possessed Motive to Mislead Investors About MVF's Utilization Rate ...................................................................... 26

    2. Defendants Received or Had Access to Internal Documents Showing MVF Had Not Reached 20% Utilization and Was Experiencing Plunging Demand .......................................................... 27

    3. Defendants' Repeated Statements Concerning MVF and Their Personal Involvement There Support a Strong Inference of Scienter ........................................................................................ 30

    4. The Critical Importance of MVF to Wolfspeed Supports a Strong Inference of Scienter................................................................ 31

    5. Additional Scienter Allegations ........................................................ 32

    6. Plaintiffs' Allegations of Fraud Are at Least as Plausible as Defendants' Non-Fraudulent Explanation ......................................... 33

IV. CONCLUSION ...................................................................................................... 34

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................... 14

*Burt v. Maasberg*,
2014 WL 1291834
(D. Md. Mar. 28, 2014) ........................................................................... 26, 27

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
496 F.Supp.3d 952 (E.D. Va. 2020) ...................................................... 32, 33

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
827 F.Supp.2d 559, 575-76 (D.S.C. 2011) ............................................ 22, 23

*City of Southfield General Employees' Retirement System v. Advance Auto Parts, Inc.*,
167 F.4th 637 (4th Cir. 2026) ....................................................................... 29

*Cutshall v. Humacyte, Inc.*,
2026 WL 893199
(M.D.N.C. Mar. 31, 2026) .......................................................................13-14

*Dahhan v. OvaScience, Inc.*,
321 F.Supp.3d 247 (D. Mass. 2018) ............................................................. 23

*Employees' Retirement System of the City of Baton Rouge & Parish of East Baton Rouge v. MacroGenics, Inc.*,
61 F.4th 369 (4th Cir. 2023). ....................................................................... 24

*Epstein v. World Acceptance Corp.*,
2015 WL 2365701
(D.S.C. May 18, 2015) ............................................................................ 14, 22

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .................................................................. 28, 33

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F.Supp.3d 65 (S.D.N.Y. 2017)............................................................... 23

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600
(S.D.N.Y. May 24, 2018)............................................................................... 28

Case 1:26-cv-00018-LAF-LPA    Document 112    Filed 04/21/26    Page 4 of 45

*In re Comput. Scis. Corp. Sec. Litig.*,
  890 F.Supp.2d 650 (E.D. Va. 2012) ........................................................................... 22

*In re Emergent BioSolutions Inc. Sec. Litig.*,
  2023 WL 5671608
  (D. Md. Sep. 1, 2023).............................................................................................. 28, 32

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F.Supp.2d 367 (S.D.N.Y. 2012)............................................................................ 30

*In re Genworth Fin. Inc. Sec. Litig.*,
  103 F.Supp.3d 759 (E.D. Va. 2015) ............................................................... 23, 31, 34

*In re James River Grp. Holdings, Ltd. Sec. Litig.*,
  2023 WL 5538218
  (E.D. Va. Aug. 28, 2023) .................................................................................... *passim*

*In re Laboratory Corp. of America Holdings Securities Litigation*,
  2006 WL 1367428
  (M.D.N.C. May 18, 2006)............................................................................................. 23

*In re MicroStrategy, Inc. Securities Litigation*,
  115 F.Supp.2d 620 (E.D. Va. 2000) ................................................................. 26, 27, 32

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .............................................................................. 17, 20

*In re Trex Co., Inc. Sec. Litig.*,
  454 F.Supp.2d 560 (W.D. Va. 2006) ........................................................................... 19

*In re Virtu Fin., Inc. Sec. Litig.*,
  770 F.Supp.3d 482 (E.D.N.Y. 2025) ...................................................................23-24, 27

*Inst'l. Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)......................................................................................... 28

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
  2016 WL 3981236
  (D.S.C. July 25, 2016).................................................................................... 30, 31, 34

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) ...................................................................... 12, 15, 31, 32

*Kiken v. Lumber Liquidators Holdings, Inc.*,
  155 F.Supp.3d 593 (E.D. Va. 2015) ...................................................................*passim*

*Kurzweil v. Philip Morris Co.*,
  1997 WL 167043
  (S.D.N.Y. Apr. 9, 1997)...................................................................................... 21

*Lefkoe v. Jos. A. Bank Clothiers*,
  2008 WL 7275126
  (D. Md. May 13, 2008) ....................................................................................... 17

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
  876 F.3d 541 (4th Cir. 2017) ............................................................................. 31

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)............................................................................................. 14

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................................... 25, 30

*Oklahoma Firefighters Pension & Retirement System v. K12, Inc.*,
  66 F.Supp.3d 711 (E.D. Va. 2014) ..................................................................... 24

*Ollila v. Babcock & Wilson Enters., Inc.*,
  2018 WL 792069
  (W.D.N.C. Feb. 8, 2018)............................................................... 22, 23, 25, 28

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)............................................................................ 21, 24, 25

*Phx. Ins. Co. v. ATI Physical Therapy, Inc.*,
  690 F.Supp.3d 862 (N.D. Ill. 2023) ................................................................... 33

*Pipefitters Local No. 636 Defined Ben. Plan v. Tekelec*,
  2013 WL 1192004
  (E.D.N.C. Mar. 22, 2013) ................................................................................. 20

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F.Supp.3d 602 (S.D.N.Y. 2015)...............................................................28-29

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ................................................................... 27

*Roberts v. Zuora, Inc.*,
2020 WL 2042244
(N.D. Cal. Apr. 28, 2020) ....................................................................... 18

*Rudani v. Ideanomics, Inc.*,
2020 WL 5770356
(S.D.N.Y. Sep. 25, 2020) ........................................................................ 23

*Sciolino v. City of Newport News, Va.*,
480 F.3d 642 (4th Cir. 2007) ................................................................... 34

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) ................................................................... 15

*Sinnathurai v. Novavax, Inc.*,
645 F.Supp.3d 495 (D. Md. 2022) ...................................................... 17, 32

*Teachers' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)............................................................................ 17, 25

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) .............................................................. 31, 32

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ................................................................... 17

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78j(b)............................................................................................ 1, 14, 34
§78t(a) .................................................................................................. 1, 34
§78u-4(b)(1) ............................................................................................ 14

Federal Rulse of Civil Procedure

Rule 9(b) ................................................................................................ 14

Rule 10b-5 ............................................................................................. 14

Rule 12(b)(6) .................................................................................... 13, 14

Rule 15(a) .............................................................................................. 34

§10(b) .............................................................................................. 14, 34

§20(a) ..................................................................................................... 34

Case 1:26-cv-00018-LAF-LPA     Document 112     Filed 04/21/26     Page 8 of 45

Plaintiffs submit this memorandum of law opposing the motion to dismiss the Consolidated Amended Complaint ("Complaint") filed by Wolfspeed, Inc. ("Wolfspeed" or the "Company"), Gregg Lowe (former CEO) and Neill Reynolds (former CFO) (together, "Defendants").[1] Plaintiffs assert claims against Defendants under §§10(b) and 20(a) of the Exchange Act on behalf of Wolfspeed securities purchasers from August 16, 2023 through November 6, 2024 (the "Class Period").

## I. INTRODUCTION

In April 2022, Wolfspeed announced the opening of its much-anticipated Mohawk Valley fabrication facility ("MVF") in Marcy, New York. By early 2023, Defendants were telling investors that overwhelming and rapidly growing demand in the electric vehicle ("EV") market far outpaced the Company's then-current production capabilities, and that the production ramp of MVF was critical to the Company's success.

In August 2023, Defendants told investors that MVF would reach 20% utilization by the June 2024 quarter, which would translate into $100 million in revenue in the December 2024 quarter. Over the next several quarterly earnings calls, Defendants repeatedly assured investors that MVF was on track to achieve those utilization and revenue targets. On June 24, 2024, Defendants announced that MVF had achieved 20% utilization.

---

[1] References to "¶" are to the Complaint (ECF No. 57). "MTD" refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint (ECF No. 104). "Pl. Ex." refers to exhibits attached to the Declaration of Alan Ellman, submitted herewith. Undefined capitalized terms are as defined in the Complaint. Emphasis is added and internal citations and quotations are omitted unless otherwise noted.

In truth, MVF never achieved anything close to 20% capacity utilization. According to former employees ("FEs") who worked as an Accounting Director and a Financial Analyst and reviewed the Company's profit-and-loss ("P&L") statements and conducted financial reviews—which included information on MVF's utilization—MVF was not "getting to the level of volume" "quickly enough," "w[as] far behind where [management] expected it to be," and by September 2024 was only at about 10% utilization. The FEs also reported that by January 2024, the demand for Wolfspeed's products had plummeted. And by June 2024, "there was definitely a lot of panic setting in" because sales and orders were "falling quick...across the board, in every business unit." According to the FEs, Defendants knew of or had access to internal reports reflecting this information. Thus, the Complaint alleges that when Defendants made these statements, they knew, or were at least reckless in not knowing, that they were false.

After a series of partial disclosures of the truth about Wolfspeed's overstated growth potential, the Company's stock price declined. Then, on November 6, 2024, Wolfspeed announced its financial results for 1Q25[2] and unveiled guidance for 2Q25 well-below expectations. Although Defendants had repeatedly claimed that 20% utilization of MVF would result in $100 million of revenue out of the facility, Defendants now guided to a range 30%-50% below that mark. Admitting what it had long denied, Wolfspeed attributed its

---

[2]    Wolfspeed's fiscal year ends on June 30 of each year. Accordingly, Wolfspeed's first fiscal quarter ends on September 30 (1Q), and so on. ¶7 n.1.

- 2 -

results and lowered guidance to "demand...ramp[ing] more slowly than we originally anticipated." Wolfspeed's stock price plummeted 39% in response.

This case is not an effort to recast a business setback as fraud. The Complaint alleges that Defendants made specific, measurable representations about MVF utilization and product demand while contemporaneous internal reporting showed the opposite. All of Defendants' arguments should be rejected and their motion should be denied in its entirety.

## II.   FACTUAL BACKGROUND

### A.   Wolfspeed's Success Revolved Around MVF

Wolfspeed manufactures silicon carbide ("SiC") materials used in EVs. ¶¶4-6. During the Class Period, Defendants told investors that Wolfspeed was uniquely positioned to benefit from accelerating adoption of SiC devices in EVs, contingent on successfully ramping production at MVF. ¶¶31-35, 42. Defendants asserted that once MVF reached 20% utilization, the facility would begin producing approximately $100 million in quarterly revenue by 2Q25, ending December 31, 2024. ¶7.

MVF's ramp also carried immediate financial significance. In June 2023, Wolfspeed issued $1.25 billion in senior secured notes due 2030 (the "Secured Notes"), which required Wolfspeed to maintain at least $500 million in unrestricted cash. ¶¶252-253. That threshold would drop to $325 million if Wolfspeed achieved 30% MVF utilization, together with related revenue targets, and would be eliminated entirely at 50% utilization with corresponding revenue milestones. ¶254. The pace and success of the MVF ramp therefore affected both operations and liquidity.

- 3 -

The market understood MVF's importance to Wolfspeed. Several prior delays to the MVF ramp already strained investor confidence. ¶7. Wolfspeed's Durham fabrication facility was already operating at capacity, meaning future growth depended on MVF. ¶¶30, 42. Analysts emphasized that Wolfspeed's "financial performance and the investment thesis" had become "disproportionately weighted" toward MVF, with one summarizing: "All roads lead to Mohawk Valley." ¶¶40, 126; *see also* ¶¶45-48, 190-201.

**B.** **Defendants Told Investors that MVF Was on Track to Reach the Critical 20% Utilization Milestone**

Throughout the Class Period, Defendants delivered a consistent message: despite prior execution problems and repeated delays, MVF was operating as expected and remained on track to reach 20% utilization. ¶¶105-109, 113-114, 130, 141, 146. Defendants grounded these assurances in claimed firsthand oversight. On October 30, 2023, Lowe told investors he had been "in the fab" the prior week, met with engineers working on the ramp, and would return multiple times the following month because he was "personally laser-focused on the Mohawk Valley ramp to 20% utilization in the June quarter." ¶¶120-121. He stated that Wolfspeed was already producing enough material to support 15% utilization at MVF and was therefore "on track" to reach 20% utilization by June 2024. ¶113. On May 1, 2024, Lowe reiterated Wolfspeed was "on track" to achieve 20% utilization in MVF by June and that, "as of April, we are already at more than 16% utilization," making management "extremely confident" in reaching the June target. ¶146.

- 4 -

Analysts understood Defendants' statements as confirmation that MVF had turned the corner. They reported that "MVF is finally ramping well," "the big stuff is starting to happen," and that MVF was "ramping nicely." ¶¶138, 140, 153.

## C. Defendants Told Investors that Demand Exceeded Supply

Defendants paired their assurances about MVF's ramp with a second critical representation: demand exceeded supply. ¶¶42-43. They told investors that once MVF reached 20% utilization, capacity would translate into revenue because demand was already waiting. *Id*.; ¶114. On October 30, 2023, Lowe stated demand "more than satisf[ied]" the 20% target, that "customers' needs are higher than our current output levels," "demand remains very strong," and Wolfspeed would see "more demand than there will be supply" for years to come. ¶¶116-118, 121. Reynolds described demand as "very heavy." ¶119.

Defendants repeated this theme throughout 2024. In January, Lowe cited "continuing and growing robust demand," while Reynolds confirmed demand "continues to remain strong." ¶¶130, 136. In March 2024, Lowe said, "[W]e still have a demand scenario that is substantially higher than our supply for the foreseeable future," and possible shifts in the EV market were "not going to matter to us because the supply is not meeting the demand right now[.]" ¶¶142-143. In May 2024, Defendants said Wolfspeed remained "substantially supply constrained," with EV demand continuing "to outstrip our available capacity." ¶¶146-150; *see also* ¶¶154-155. On June 24, 2024, Wolfspeed discussed the "growing demand" for SiC devices. ¶161. Defendants' message was unequivocal: Wolfspeed had no

- 5 -

demand problem—it had a supply problem, and MVF would solve it. Internally, however, the opposite was true.

**D.      Defendants Knew MVF Was Not Hitting Utilization Targets and Demand Was Collapsing**

**1.      Internal Reporting Showed MVF Operating Far Below the Utilization Levels Defendants Claimed**

According to former Wolfspeed employees, by early 2024, Wolfspeed's internal reporting showed that MVF was operating well-below touted levels. *See generally* ¶¶52-104. Former Employee 1 ("FE1") was Wolfspeed's Global Cost Accounting Director from June 2023 through September 2024, and reported to Vice President ("VP") of Corporate Finance Chuck Burnside, who reported to Reynolds. ¶52. In that role, FE1 oversaw standard costing, inventory evaluation, and inventory accounting, which included preparing monthly internal-margin reviews. ¶53. FE1 had access to information about MVF's utilization, and was responsible for reporting the "actual results" of MVF in the form of a monthly "financial review" or "P&L" review. *Id*. The P&L reviews were maintained in Excel spreadsheets and stored on a shared Microsoft OneDrive server. *Id*. According to FE1, there was a tab for companywide revenue and cost margin, along with separate tabs showing those figures for the Company's plants in North Carolina and New York. *Id*.

These reviews included MVF's utilization; if the facility was "not hitting" the "planned utilization," Wolfspeed would need to "carry a variance," which FE1 had to apply. ¶54. FE1 also participated in monthly calls about the P&L reviews with Senior VP-Finance

- 6 -

Kevin Speirits[3] and plant and business-unit controllers, where he "read[] out and explain[ed]" these results to Speirits. *Id*. FE1 "would have assumed" that Lowe and Reynolds received the P&L reviews. *Id*.

FE1 explained that Wolfspeed was "slower" to bring MVF "up and running," and was not reaching expected volume levels. ¶57. Although the target for MVF was 20% utilization (¶58), "by the time we got to the point of the margin review, everyone knew we weren't hitting the number." *Id*. FE1 said he and others on the Finance side were "asking questions" and seeing that the P&L "doesn't look like where we're forecasted." *Id*. Through margin reviews he conducted, FE1 assessed expected "absorption" and determined "we weren't hitting 20% absorption," which was equivalent to utilization except utilization was typically "quantity-based" and absorption was on a "dollar basis." ¶59. Critically, as to whether MVF reached 20% utilization by June 2024, FE1 stated, "I never saw that number." "I never saw anything with that 20% on it internally." ¶60. FE1 said, "It wasn't 20% utilization...It wasn't 20% of capacity, which was what the original target was." *Id*. Instead, when FE1 left the Company in September 2024, MVF's utilization was "only at like 10%," and "there was a lot of pressure" on the New York team for failing to meet the 20% target. *Id*.

Former Employee 2 ("FE2") joined Wolfspeed in February 2024 as a Financial Analyst working for the Company's Discrete Power Devices business unit, and left

---

[3] After Reynolds left Wolfspeed, Speirits became interim CFO. *See* ECF No. 59-2.

Wolfspeed in October 2024.[4]  ¶55.  His role involved "analyzing the profitability" of MVF and the Durham facility, which then "rolled up into a final [P&L] statement."[5]  *Id*.  FE2 reported to Senior Director-Power Finance, Hunter Lane, who reported to Reynolds, directly or through a VP.  ¶56.  FE2 corroborated FE1's account of Wolfspeed's operational shortfall. He explained that "as soon as I joined" it was apparent MVF was not meeting internal production targets.  ¶57.  Although FE2 did not recall a precise utilization figure, he explained that "they weren't where they needed to be," and "that was a big issue."  *Id*. Asked how he knew this, FE2 explained, "It was just open knowledge," and MVF's problems were a "driving force" behind a "lot of financial issues."  *Id*.  By June 2024, production at MVF remained "far behind where they expected to be"—with output "not nearly as much as should have been."  ¶60.

### 2. Internal Reporting Showed Demand for Wolfspeed's Products Was Weakening

At the same time MVF was failing to ramp, internal reporting showed demand was deteriorating, directly contrary to Defendants' repeated assurances that demand exceeded supply.  Soon after joining Wolfspeed in February 2024, FE2 observed that "the volume or the demand just fell off a cliff" and pricing decreased.  ¶63.  The drop in demand was "pretty much across the board," including the EV sector.  *Id*.  FE2's knowledge came from "what

---

[4]    The end-date of FE2's employment was inadvertently not pled in the Complaint.  If the Court deems it necessary, Plaintiffs will amend the Complaint to plead the duration of FE2's employment.  Nevertheless, it is clear from the Complaint that FE2 worked at Wolfspeed through at least June 2024, as he alleged events occurring during that month.  ¶60.

[5]    A rollup groups accounts together for reporting purposes.  ¶69 n.4.

[he] saw coming in" when reviewing Wolfspeed's P&L statements, including actual performance against forecast. ¶64. He also noted that Senior Demand Manager Matthew Bolick "would point to this crazy demand schedule that I never thought—there was no way they were going to achieve it," and that these issues were discussed in meetings that FE2 participated in. ¶77.

FE1 similarly stated that Wolfspeed's projected revenue and growth was unrealistic, based on direct conversations with Sales financial analysts and controllers, who believed the Company had set an "unrealistic number." ¶65. FE1 explained management's "expectation around the volume didn't match with reality," noting that "over the last two years, the EV market has changed drastically." ¶66. Consistent with this, FE2 attributed declining demand, in part, to "too aggressive" expectations for the U.S. EV market. ¶70. By January and February 2024, FE1 reported, "a lot of concerns around softening demand" were raised during the "budgeting process," as the market was "declining pretty quickly." ¶67. By February or March 2024, Wolfspeed had burned through its backlog. ¶68. FE2 likewise confirmed that the decline in demand was known within Wolfspeed by no later than February 2024. ¶73.

By June 2024, FE1 recalled "you could feel the pressure" and "there was definitely a lot of panic setting in" because sales and orders were falling across "every business unit." ¶69. FE1 knew this in part from reviewing Wolfspeed's "final rollup" budget, which included sales, margin and net income, and understood that those materials would go to Lowe and Reynolds. *Id*.

This deterioration was reflected in Wolfspeed's internal reporting and operations. FE2 and his team prepared weekly reports for the VP level, at the direction of Lane, tracking revenue, backlog, pricing, cost, facility performance, and demand planning. ¶76. These reports showed quarter-over-quarter declines in both revenue and demand, including instances where revenue fell by approximately 50% from one period to the next, reflecting sharply reduced customer demand. *Id*. The reports were "sent to the chain" of employees "underneath" Lowe and Reynolds, including VPs and Directors, FE2 said. *Id*.

Finance personnel also attempted to escalate the issue internally. FE2 recalled that Lane and others were "constantly fighting" to communicate that "something has to change" with respect to wafer costs and pricing in light of weakening demand. ¶74. FE2 stated there was "no way" senior leadership could have been unaware of the decline in demand because "everyone was aware that there was an issue." ¶75. He reiterated the decline was "definitely a problem that was talked about" throughout Wolfspeed, and that he personally raised it. *Id*.

The consequences were immediate and concrete. Wolfspeed implemented substantial price reductions—sometimes "as large as 50%"—to move product. ¶79. According to FE2, the Company was forced to sell product at a loss. ¶82. FE2 and other analysts under Lane "were all saying the same thing," that changes to wafer costs and pricing were needed, and conveyed in regular calls with Lane that "there were issues." ¶83. At the same time, inventory was building, not moving, with "hundreds of thousands of pieces" of unsold inventory, including customer-specific components that could not be readily redeployed.

- 10 -

¶¶80-81. FE2 stated that Lane "conveyed to us" that "he shared" with upper management "that there were issues" with falling demand and pricing. ¶84.

FE1 similarly described repeated revisions to Wolfspeed's internal budgets during summer 2024 as finance personnel struggled to respond to weakening demand and falling revenue. ¶85. By the time FE1 left the Company in September 2024, Wolfspeed still had not finalized its budget for the next fiscal-year, which had begun the previous July, after months of revisions driven by deteriorating demand conditions. *Id*. FE1 confirmed the constant back-and-forth between rollups and budget/projections reflected efforts to address falling demand, including "where we can cut costs," and "how do we help save margin." *Id*. FE1 understood the final rollup budget documents would go to Lowe and Reynolds. *Id*. In September 2024, "there was a lot of panicking around demand" in general. *Id*.

### E. Even as the Truth Began to Emerge, Defendants Doubled Down

The first public signal that Wolfspeed's story was beginning to unravel came on June 20, 2024, when *Reuters* reported that Wolfspeed had delayed construction of its planned German facility and reduced capital spending amid weakness in European and U.S. EV markets. ¶157. Wolfspeed's stock fell 8.6% in response. ¶159.

Four days later, however, Defendants reaffirmed their narrative. On June 24, 2024, Wolfspeed announced that it had reached its 20% utilization target at MVF, and Lowe said the Company was "well-positioned" to continue executing its strategy (¶161), even though Wolfspeed's own internal reporting told a different story.

On August 21, 2024, Wolfspeed reported quarterly losses and revenue below analyst expectations and announced plans to close its Durham facility as part of cost-cutting efforts. ¶165. Wolfspeed's stock price fell 6.8% in response. ¶167. Yet Lowe continued to project strength, stating additional capacity could support even higher utilization levels of 25%-30% at MVF and that Wolfspeed's "revenue in the EV market continues to be strong." ¶¶170-171. Reynolds likewise assured investors that Wolfspeed expected "significant growth" in EV demand. ¶173. On September 4, 2024, Lowe reiterated that MVF hit 20% utilization, said MVF had "now turned into a very good asset for us," and suggested that increasing utilization beyond the initial ramp would be easier going forward. ¶¶177-178.

By November 6, 2024, the gap between Defendants' story and reality could no longer be concealed. That day, Wolfspeed reported 1Q25 revenue of $195 million, of which MVF contributed $49 million. ¶180. After repeatedly telling investors that 20% utilization at MVF would translate into $100 million in quarterly revenue by 2Q25, Wolfspeed now guided to only $50 million to $70 million in revenue from MVF for that quarter.[6] ¶¶180-181. That revised guidance bore no resemblance to the story Defendants had spent the prior

---

[6] Defendants focus on the fact that MVF's $49 million in 1Q25 revenue was "just 2%[] shy of its projected quarterly range." MTD at 6. But the salient allegation is that Defendants reduced MVF's revenue guidance for 2Q25—which they had been touting during the entirety of the Class Period—by *30%-50%*. ¶15. Ultimately, on January 29, 2025, Wolfspeed filed a Form 8-K filed with the SEC reporting that MVF contributed only $52 million in revenue for 2Q25—*a miss of 48%*. *See* Pl. Ex. 1 at 1. This corroborates FE1's allegation that MVF never reached 20% utilization, as the resulting revenue was barely half as much as Defendants assured investors it would be. The Court can take judicial notice of Wolfspeed's SEC filings. *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021) ("*DXC*").

fifteen months telling the market. Defendants also finally admitted what they had long denied—Lowe attributed the shortfall to weak demand and customer delays. ¶181. According to FE1, Wolfspeed's failure to reach the $100 million revenue mark from MVF was due both to not reaching the 20% utilization rate and because Wolfspeed's sales were declining. ¶61.

At the same time, Wolfspeed announced closure or suspension of three fabs, a 20% workforce reduction, and a $100 million reduction in capital expenditures. ¶181. Reynolds also stated that Wolfspeed would reduce utilization to burn inventory. ¶183. These disclosures confirmed both halves of the fraud at once: MVF was not generating the promised revenue Defendants tied to 20% utilization (which, as Plaintiffs allege, Wolfspeed never actually achieved), and demand did not exceed supply. Wolfspeed's stock price fell a staggering 39.2% in response. ¶¶186-188.

Less than two weeks after the November 6 disclosure, Wolfspeed announced that its Board had "determined and agreed with Lowe" that he would depart at that time. ¶¶246-248. Analysts immediately connected Lowe's departure to the MVF and demand issues. ¶¶249-250. The fallout did not end there. On June 30, 2025, Wolfspeed filed for Chapter 11 bankruptcy. MTD at 6-7.

## III.   ARGUMENT

The purpose of a Rule 12(b)(6) motion to dismiss is to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Cutshall v. Humacyte, Inc.*, 2026 WL 893199, at *14 (M.D.N.C.

Mar. 31, 2026).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To be facially plausible, a claim must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable[.]"  *Id*.  "In considering a motion to dismiss, the Court…views the facts in the light most favorable to the plaintiff."  *In re James River Grp. Holdings, Ltd. Sec. Litig.*, 2023 WL 5538218, at *5 (E.D. Va. Aug. 28, 2023).  Securities-fraud complaints are subject to the heightened pleading requirements of the PSLRA and Rule 9(b), discussed below.  *Cutshall*, 2026 WL 893199, at *15.

To state a §10(b) and Rule 10b-5 claim, plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  Defendants contend Plaintiffs have failed to adequately allege the first and second elements.  MTD at 8.

### A.      The Complaint Adequately Alleges Material Misstatements and Omissions, and the FE Allegations Should Be Credited

A securities-fraud complaint adequately pleads a false or misleading statement by "specify[ing] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading[.]"  15 U.S.C. § 78u-4(b)(1).  Further, "any statement or omission of fact must be material, meaning objectively significant to a reasonable investor."  *Epstein v. World Acceptance Corp.*, 2015 WL 2365701, at *5 (D.S.C. May 18, 2015).  "Even

- 14 -

when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018). Plaintiffs need only plead a plausible inference of falsity. *See James River*, 2023 WL 5538218, at *8.

The Complaint satisfies the applicable standards by alleging three categories of material misstatements and omissions.

### 1. Statements Asserting MVF Achieved 15%-20% Utilization

Defendants falsely stated Wolfspeed achieved between 15%-20% utilization between October 2023 and the end of the Class Period. *See supra* at 4, 11-12. The Complaint plausibly alleges those statements were false when made because, according to FE1, Wolfspeed never exceeded 10% utilization during that period. *See id*. at 7. And according to FE2, by June 2024, production at MVF remained "far behind where [they] expected it to be"—with output "not nearly as much as should have been." *Id*. at 8. That directly contradicts Defendants' utilization narrative. Defendants dismiss these allegations as vague and conclusory. MTD at 10. They are neither.

### a. The FEs Are Adequately Pled

"Generally, plaintiffs are free to use the allegations of confidential witnesses to support an inference of scienter." *DXC,* 19 F.4th at 609. "However, such allegations will only be afforded the weight they are due given their indicia of reliability[.]" *Id*. "Where a complaint relying in part on confidential witnesses lists the dates of these individuals' employment, the various positions they held, the duties that they fulfilled, where they

- 15 -

worked, with whom they conversed and to whom they reported, this information allows the Court to assess what information the confidential witnesses had available to them and properly weigh the inferences derived from the confidential witnesses' allegations." *James River*, 2023 WL 5538218, at \*25; *see also Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007) (confidential-witness allegations must "support the probability" that the witness possessed the information alleged).

The Complaint easily satisfies that standard. *See supra* at 6-8 (**FE1**: Global Cost Accounting Director responsible for reporting MVF's "actual results" through monthly P&L reviews; reviewed utilization through "absorption"; never saw internal reporting reflecting 20% utilization; observed MVF at "only at like 10%" by September 2024; **FE2**: Financial Analyst analyzing MVF profitability rolled into companywide P&L; recognized "as soon as [he] joined" that MVF was not meeting internal targets; by June 2024 output remained "far behind" expectations). These are not generalized allegations—they are based on firsthand access to Wolfspeed's core financial and operational reporting.

Defendants argue that FE1 provides no specifics as to timing or amount of utilization shortfalls, and no document expressly reflecting 10% utilization. MTD at 12-14. Plaintiffs are not required to quote internal spreadsheets. They must plead facts showing the witness's access to, and knowledge of, the information alleged. The Complaint does exactly that: FE1 makes clear MVF never reached 20% utilization during his tenure, and it was approximately

- 16 -

10% when he left in September 2024—based on his responsibility for reporting MVF's actual results.[7] ¶¶53-54, 59-60; *supra* at 6-7.

The same is true for FE2. Defendants deride his allegations as "opinion." MTD at 13-14. But the Complaint alleges that FE2 was in position to know production at MVF was "far behind" where Wolfspeed expected to be (¶60), as his role involved "analyzing the profitability" of MVF, which then "rolled up into a final [P&L] statement." ¶55; *see also supra* at 8. That is a concrete basis of knowledge, not speculation. This is sufficient in the Fourth Circuit to plead allegations based on confidential witnesses ("CWs"). *See Lefkoe v. Jos. A. Bank Clothiers*, 2008 WL 7275126, at *7 (D. Md. May 13, 2008) (crediting CW allegations where complaint provided "job descriptions that suggest that the sources would have personal knowledge of the facts alleged and, in many cases, provides multiple sources to corroborate facts"); *Sinnathurai v. Novavax, Inc.*, 645 F.Supp.3d 495, 524 (D. Md. 2022) (same).[8]

Finally, Defendants' argument that the FEs are deficient because they were not employed for the entire Class Period fails as a matter of law. MTD at 11; *see, e.g.*, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (crediting allegations from

---

[7]    Defendants claim FE1 does not explain what a "margin review" is, and how details about an "absorption rate" would have demonstrated Wolfspeed was not on pace to hit its utilization targets, MTD at 12, but FE1 explains both. ¶59.

[8]    Contrary to Defendants (MTD at 10, 15-16), confidential-witness hearsay is permitted. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009) ("[U]nder the Court's test in *Tellabs*[,]…the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus.") (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 n.5 (2007)).

CW not employed at company during class period but possessing personal knowledge of defendants' access to reports); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) ("[T]he Court is not persuaded by defendants' assertion that the CW allegations are deficient because the CWs did not work at Zuora for the entire class period."). FE1 worked at Wolfspeed for all but two months of the 15-month Class Period, including when Defendants claimed to have reached 20% utilization at MVF, and does not address post-departure developments. *See supra* at 6-7. And FE2 worked from February 2024 until October 2024, *see id*. at 7-8, during the period of many of Defendants' challenged statements regarding demand and MVF utilization. *See id*. at 4-5, 11-12.

### 2. Statements Concerning Demand for Wolfspeed's Products

Defendants' statements that demand for their products was strong were false and misleading because, according to the FEs, demand was deteriorating throughout the Class Period. *See supra* at 8-11. FE2 observed a significant decline in demand soon after joining Wolfspeed in February 2024, based on "what [he] saw coming in" from P&L statements comparing actual performance to forecast. ¶¶63-64. FE1 said that Wolfspeed's projected revenue outlook and anticipated growth was unrealistic based on direct conversations he had with Wolfspeed's Sales financial analysts and controllers. ¶65. By January and February 2024, there were "a lot of concerns around softening demand," including during the budgeting process, and by February or March 2024, Wolfspeed had burned through its backlog. ¶¶67-68. By June 2024, the deterioration had intensified: FE1 described "pressure" and "a lot of panic" as sales and orders "were falling quick" "across the board, in every

- 18 -

business unit." ¶69. FE1 observed this through Wolfspeed's "final rollup" budget, which included sales, margin and net income. *Id*. At the same time, FE2 reported that Wolfspeed implemented "significant" price cuts due to the sharply declining demand—sometimes "as large as 50%"—to move product, including parts made at MVF. ¶79. FE2 knew this from "work[ing] directly with the pricing team." *Id*. The Complaint thus alleges not just weakening demand, but its concrete operational consequences: backlog depletion, collapsing orders, sharply reduced prices, and mounting inventory. These allegations demonstrate Wolfspeed "did not have a growing demand for its products[.]" MTD at 18 n.14 (quoting *In re Trex Co., Inc. Sec. Litig.*, 454 F.Supp.2d 560, 580 (W.D. Va. 2006)).

Defendants argue the FEs' allegations "do not engage with what Wolfspeed actually said about demand," or provide timing specifics. MTD at 16-18. Not so. In January 2024, Lowe pointed to "continuing and growing robust demand" while Reynolds confirmed that demand "continues to remain strong." ¶¶130, 136. In May 2024, Defendants emphasized that Wolfspeed remained "substantially supply constrained," and that EV demand "continues to outstrip our available capacity." ¶¶146-148. On June 24, 2024, Wolfspeed noted "the growing demand for silicon carbide power devices." ¶161.[9] The FEs' allegations directly contradict these statements, both as to their substance and their timing. Publicly, Defendants claimed supply constraints; internally, demand was weakening sharply, backlog was exhausted, prices were cut, and inventory was building. That is the contradiction.

---

[9] Defendants argue that FE1's allegations of declining demand in June 2024 "do not connect to any challenged statement[.]" MTD at 17. That is incorrect. Plaintiffs expressly challenge Wolfspeed's June 24, 2024 statement about the growing demand for SiC devices.

Defendants' specificity argument fares no better. They contend FE2 failed to identify the precise contents of internal reports. MTD at 17-18. The specificity of FE2's statements, however, are self-evident—he alleged: (1) weekly reports, (2) created at Hunter Lane's request, (3) sent to Wolfspeed VPs, and (4) depicted quarter-over-quarter declines in revenue and demand of as much as 50% (¶76)—and there is no requirement to plead greater specificity.[10] *See Quality Sys.*, 865 F.3d at 1145 (crediting allegations of declining sales without details of report contents). Defendants' assertion that FE2 failed to allege "at which meetings contradictory information" was discussed, MTD at 18, is simply untrue. *See* ¶¶74, 77, 83-84 (describing communications with Lane and Bolick).[11]

### 3. Statements About the Pace of the MVF Ramp, Projected Utilization Rate, and Projected Revenue

Defendants' statements regarding the pace of MVF's ramp-up and projected utilization rate[12] as well as its projected revenue[13] are actionable, even if characterized as forward-looking and opinions, because Defendants omitted then-existing, known facts that made their statements misleading. Defendants failed to disclose that MVF was not ramping as represented and was not achieving targeted production levels. *Supra* at 6-8. They

---

[10] Because the FEs allege the contents of internal reports, Defendants' cases are inapt. *See* MTD at 29.

[11] *Pipefitters Local No. 636 Defined Ben. Plan v. Tekelec*, 2013 WL 1192004 (E.D.N.C. Mar. 22, 2013), cited by Defendants (MTD at 18), is easily distinguished. There, unlike here, plaintiffs did not "allege[] the existence of any internal documents...contradicting the inference that defendants acted with a lawful intent." *Id*. at *15.

[12] ¶¶106–109, 113–114, 130, 133, 135–36, 141, 146, 162, 170-171, 177–178.

[13] ¶¶109, 133, 136, 172.

- 20 -

likewise concealed that MVF never achieved a monthly or quarterly utilization above 10% during the Class Period. *Id*. at 7. And they failed to disclose weakening demand for their SiC products, inventory buildup, and resulting price reductions. *Id*. at 8-11. Those omissions deprived Defendants' projections of any reasonable basis. Projections are actionable when they lack a reasonable basis. *See Kurzweil v. Philip Morris Co.*, 1997 WL 167043, at *8 (S.D.N.Y. Apr. 9, 1997); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015) (opinion statement must "fairly align[] with the information in the issuer's possession at the time").

### a.  The FEs' Allegations Are Sufficiently Detailed

Defendants argue FE1's allegations regarding the pace of the MVF ramp-up, projected utilization rate, and projected revenue are devoid of specifics about dates or quantification, and FE2 only provides vague speculation and opinion. MTD at 12-13, 15-16. The FEs' allegations are well-pled because they are detailed and the FEs were in the position to know these facts. *See supra* at 6-8. In addition, Defendants' projection of $100 million of revenue by December 2024 did not fairly align with the information in Defendants' possession because it was predicated on MVF reaching 20% utilization, which, as the FEs' allegations demonstrate, did not occur. At the pleading stage, the allegations in the Complaint must be viewed in the light most favorable to Plaintiffs. *See James River*, 2023 WL 5538218, at *5.

- 21 -

### b. The Safe Harbor Does Not Apply

Defendants contend that statements regarding MVF's ramp, projected utilization, and projected revenue are protected by the PSLRA's safe harbor. MTD at 19-20. These statements are not protected by the safe harbor because Defendants omitted then-existing, undisclosed facts concerning problems at MVF and lack of demand that rendered their projections misleading. *See supra* at 6-11. The safe harbor only protects statements: (1) which are identified as forward-looking and accompanied by meaningful cautionary language; (2) which are immaterial; or (3) where there was no actual knowledge that the statement was false or misleading. *Epstein*, 2015 WL 2365701, at *6. The safe harbor does not protect representations of current or historical fact.[14] *In re Comput. Scis. Corp. Sec. Litig.*, 890 F.Supp.2d 650, 668 n.21 (E.D. Va. 2012).

Further, "meaningful, cautionary language" must be "substantive and tailored" to the challenged statements. *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 827 F.Supp.2d 559, 575-76 (D.S.C. 2011). Cautionary language is not "meaningful" if it warns of risks which have, in fact, already materialized. *See Epstein*, 2015 WL 2365701, at *6. "While strong cautionary language undermines securities fraud claims, district courts in the Fourth Circuit have hesitated to rule on the adequacy of cautionary language at the motion to dismiss stage." *James River*, 2023 WL 5538218, at *16 (citing *Ollila v. Babcock & Wilson*

---

[14] Importantly, Defendants do not contend the alleged misstatements concerning (1) MVF's claimed historic achievement of 15%-20% utilization (¶¶113, 146, 161, 177-178), and (2) current demand (¶¶116-119, 121, 130, 136, 142-143, 147, 149-150, 154-155, 161) are forward-looking. *See* MTD at 19-23.

- 22 -

*Enters., Inc.*, 2018 WL 792069, at *5 (W.D.N.C. Feb. 8, 2018) and *In re Genworth Fin. Inc. Sec. Litig.*, 103 F.Supp.3d 759, 790 (E.D. Va. 2015)).

First, the safe harbor does not protect the challenged statements because omissions of existing facts are not forward-looking statements, and therefore are not protected by the safe harbor. *See, e.g.*, *Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, at *6 (S.D.N.Y. Sep. 25, 2020) (citing cases); *Dahhan v. OvaScience, Inc.*, 321 F.Supp.3d 247, 254 (D. Mass. 2018). Second, Defendants' cautionary language (MTD at 22-23) was insufficient as it failed to inform investors that the risks to achieving these goals had, in fact, "already been realized." *Sonoco*, 827 F.Supp.2d at 576.[15] Finally, as set forth below, *infra* at 25-33, Defendants had actual knowledge that their statements were false or misleading when made, and therefore cannot avail themselves of the safe harbor. *See Lab'y Corp.*, 2006 WL 1367428, at *3 (liability under the safe harbor exists "where a defendant has actual knowledge that the statement was false").

### c. The Alleged Misstatements Are Not Puffery

Defendants recast certain statements as puffery. *See* MTD at 24-25. But statements made to assuage investor concerns are not puffery. *See, e.g.*, *In re BHP Billiton Ltd. Sec. Litig.*, 276 F.Supp.3d 65, 79 (S.D.N.Y. 2017) (statements "become material to investors" if "made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors."); *In re Virtu Fin., Inc. Sec. Litig.*, 770 F.Supp.3d

---

[15] Defendants' reliance on *In re Laboratory Corp. of America Holdings Securities Litigation*, 2006 WL 1367428, at *4-*5 (M.D.N.C. May 18, 2006), *see* MTD at 21 n.22, is inapposite because the risk disclosures matched the facts.

- 23 -

482, 503-04 (E.D.N.Y. 2025) (statements not puffery when made "during a time of concern"). At the time of these statements, MVF's ramp was the central issue for investors. *See supra* at 3-4. Analysts were concerned about, and keenly focused on, the MVF ramp (¶¶38-51), with one writing, "[W]e believe this is the last [reset] investors will stomach." ¶51. In that context, Defendants repeatedly told investors the MVF ramp was "in really great shape" and "on track," and their ability to achieve 20% utilization was "on target."[16] MTD at 24 n.31.

Defendants' argument that "on track" is puffery is misplaced. *Id*. at 24. The cases they cite do not support that proposition. *Oklahoma Firefighters Pension & Retirement System v. K12, Inc*. found the underlying claim ("one of the best business development years in our history") was puffery, not the "on track" language itself. 66 F.Supp.3d 711, 722 (E.D. Va. 2014). *Employees' Retirement System of the City of Baton Rouge & Parish of East Baton Rouge v. MacroGenics, Inc*. did not even discuss "on track" in its analysis of puffery. *See* 61 F.4th 369, 386-87 (4th Cir. 2023).

### d. Defendants' Opinion Statements Are Actionable

Defendants' "opinion" argument fares no better. *See* MTD at 25. Plaintiffs allege that these "opinions" were not sincerely held in light of Defendants' contemporaneous knowledge of the problems plaguing MVF and declining demand. *See infra* at 25-33; *Omnicare*, 575 U.S. at 185-86. The statements are also independently actionable because

---

[16] Because MVF's utilization was intertwined with demand for Wolfspeed's products, Defendants' statements regarding demand were likewise intended to reassure the investing public, and are not puffery. *Cf*. MTD at 24.

they omitted facts that made the statements "misleading to a reasonable person."[17] *Id*. at 194; *supra* at 6-11.

### B. The Allegations Raise a Strong Inference of Scienter

Plaintiffs plead a strong inference of scienter. A plaintiff must show "either intentional misconduct or such severe recklessness that the danger of misleading investors was either known to the defendant or so obvious that the defendant must have been aware of it." *James River*, 2023 WL 5538218, at *18. Recklessness may be shown by allegations that defendants knew facts or "had access to information" contradicting their public statements. *Ollila*, 2018 WL 792069, at *3 (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). "The Court may also consider allegations of Defendants' motive and opportunity to inflate the price of the company's stock" in analyzing scienter, *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F.Supp.3d 593, 607 (E.D. Va. 2015), although pleading motive is not required. *See Tellabs*, 551 U.S. at 325. At issue is "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-23 (emphasis in original); *see also id*. at 326 (court must "assess all the allegations holistically"). "The inference...need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences," but need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324.

---

[17] Defendants incorrectly assert that Plaintiffs "only challenge the first prong" of *Omnicare*, *i.e.*, subjective belief (MTD at 25), but the Complaint plainly challenges the third prong, alleging omissions that render the statements misleading to a reasonable person.

### 1. Defendants Possessed Motive to Mislead Investors About MVF's Utilization Rate

Plaintiffs allege a particularized motive to misstate MVF's utilization rate. The Secured Notes' liquidity covenant created a direct financial incentive for Wolfspeed: achieving specified MVF utilization thresholds reduced or eliminated Wolfspeed's cash-maintenance requirements. *See supra* at 3. At 30% utilization, the requirement dropped from $500 million to $325 million; at 50%, it was eliminated entirely. *Id.* This is not a generalized corporate motive. MTD at 27.[18] As *In re MicroStrategy, Inc. Securities Litigation* explains, while motives "applicable to every corporation or corporate officer" do not suffice, a "particularized motive to commit fraud" tied to specific circumstances, plus a "showing of concrete benefits" from the alleged misstatements, may "tilt the balance in favor of scienter." 115 F.Supp.2d 620, 642–43 (E.D. Va. 2000); *see also Burt v. Maasberg*, 2014 WL 1291834, at *22–*23 (D. Md. Mar. 28, 2014) ("[M]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.").

That is exactly what is alleged here: a "concrete benefit" flowing directly from Defendants' misstatements, not common to all corporations. The motive is even stronger given Wolfspeed's liquidity constraints amidst its fraught financial situation. *See* MTD at 7 (noting Wolfspeed's bankruptcy filing shortly after the Class Period ended). Courts have

---

[18] Despite Defendants' characterization of Plaintiffs' motive allegations as "a passing reference," *id.*, the motive allegations are set forth clearly and prominently in the "Additional Allegations of Scienter" section of the Complaint. ¶¶189, 252-255.

found similar covenant or balance-sheet-driven incentives sufficient to plead motive. *See, e.g.*, *MicroStrategy*, 115 F.Supp.2d at 648 (complying with credit agreement); *Burt*, 2014 WL 1291834, at \*23 (preserving value of net operating loss); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004) (avoiding default and preserving borrowing capacity).

### 2. Defendants Received or Had Access to Internal Documents Showing MVF Had Not Reached 20% Utilization and Was Experiencing Plunging Demand

The Complaint also alleges Defendants received or had access to information directly contradicting their public statements concerning MVF's utilization rate and the demand for its SiC products. ¶¶54, 69, 75-77, 85, 202-213. FE1 conducted P&L reviews reflecting MVF utilization and understood that the final rollup documents, including sales, margin, and net income, would go to Lowe and Reynolds. ¶¶54, 69, 85. FE2 prepared weekly reports reflecting declining demand that were sent to VPs and Directors in the reporting chain beneath Lowe and Reynolds. ¶76. The fact that information contradicting Defendants' statements appeared in P&L statements, forecasts, and similar materials circulated amongst their direct reports—materials of the type routinely reviewed by CEOs and CFOs—and that declining demand was known throughout the Company at all levels, support a strong inference of scienter. ¶213. And where, as here, the statements at issue are specific, "the specificity of such statements regarding the issue is strong circumstantial evidence that Defendants were receiving some form of specific information regarding the relevant issue." *Virtu*, 770 F.Supp.3d at 522.

- 27 -

Defendants argue the FEs' allegations should be discounted because the Complaint does not allege direct contact with the Individual Defendants. *See* MTD at 28-29. Courts do not require direct contact where witnesses describe information flowing to senior management. *See, e.g.*, *James River*, 2023 WL 5538218, at *11 (scienter adequately pled where CW did not specify which executives received the reports because defendants publicly emphasized their familiarity with the process); *Ollila*, 2018 WL 792069, at *2-*3 (scienter adequately pled based on defendants' access to relevant information even though CWs did not connect reports to defendants); *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *22, *24 (D. Md. Sep. 1, 2023) (no requirement that CWs "personally inform[] the Individual Defendants of all the problems" at issue; no "'smoking-gun' evidence" required); *Inst'l. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268-69 (3d Cir. 2009) (no requirement of "direct link" between defendants and CWs); *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 773 (9th Cir. 2023) (crediting allegation that executive told CW who prepared data that another executive "presented this information to [CEO] in weekly meetings");[19] *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018) (lack of direct contact "does not undermine" CW allegations); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F.Supp.3d

---

[19] Despite Defendants' argument (MTD at 29), FE2's allegation that weekly reports reflecting declining demand were "sent to the chain of employees underneath Lowe and Reynolds" is sufficient because, similar to *Glazer*, Lane conveyed to FE2 that he shared issues about falling demand and pricing with upper management. ¶¶6, 84; *see* 63 F.4th at 773.

602, 615-16 (S.D.N.Y. 2015) ("no baseline requirement of...contact" between CWs and defendants).

Here, the Complaint alleges that senior Wolfspeed executives, including Lowe and Reynolds, were regularly informed, via recurring internal reports, of MVF's utilization problems and falling demand. *Supra* at 6-11. These allegations demonstrate that the Individual Defendants knew or at minimum recklessly disregarded information directly contradicting their public statements.

Defendants also argue that Plaintiffs fail to allege the "specific content of any report" showing inconsistency with their public statements. MTD at 29. Defendants' reliance (*id*. at 28-29) on *City of Southfield General Employees' Retirement System v. Advance Auto Parts, Inc.*, 167 F.4th 637 (4th Cir. 2026), is inapt. There, the former employee left the company "well before the start of the class period," and described a separate issue "in the past"—not the very fraud alleged in that case. *Id*. at 649. Here, the FE allegations specifically detail the content of the internal reports and show that the Individual Defendants and members of senior management were expressly informed of MVF's utilization rates and declining product demand. *See supra* at 6-11.

Defendants' only response to the Complaint's access-to-information allegations is to label them "scienter-by-status." MTD at 30. It is more than reasonable to infer that Lowe and Reynolds had access to the internal reporting described by the FEs about Wolfspeed's most important facility—one they repeatedly discussed and visited. Defendants' focus on the FEs' phrasing, *see id*. at 28-29, is a red herring; the allegations are particularized and

- 29 -

based on roles that placed the FEs in the position to know the information and how and to whom it was reported.

### 3. Defendants' Repeated Statements Concerning MVF and Their Personal Involvement There Support a Strong Inference of Scienter

Scienter is reinforced by Defendants' repeated and detailed public statements about MVF, utilization, and demand, coupled with Lowe's personal involvement. *See supra* at 4-6, 11-12; ¶¶190-201. Lowe repeatedly visited MVF and emphasized its central importance. *See id.* at 3-5. These statements and hands-on involvement in the very part of the business in which the fraud occurred strengthen the inference of scienter. *See KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016) ("*3D Systems*") (repeated public statements and "intimate involvement in the day-to-day operations...bolsters Plaintiff's claims of scienter and boosts the inference of 'actual' exposure to the problems [the company] was experiencing"); *Kiken*, 155 F.Supp.3d at 607 (repeated discussions and "strong representations of the 'breadth and depth' of Defendants' review of [the company's] operations support the inference that Defendants knew, or should have known," about the problems).[20] At minimum, speaking repeatedly on matters they failed to investigate constitutes recklessness. *See Novak*, 216 F.3d at 309 (pleading standard met where defendant "consistently reassured the plaintiff...but never actually investigated...to determine whether there was a basis for the defendant's assertions").

---

[20] *See also In re Gen. Elec. Co. Sec. Litig.*, 857 F.Supp.2d 367, 395-96 (S.D.N.Y. 2012) ("In order to speak so knowledgeably regarding the state of [defendant's] finances, [the CFO] must have educated himself regarding [defendant's] financial health[.]").

- 30 -

As in *3D Systems*, "[i]n combination with their positions at [Wolfspeed], these revelations of personal and intimate involvement with many of the allegedly misrepresented issues allows the Court to reasonably infer each Individual Defendants' knowledge regarding the true state of affairs" at Wolfspeed. 2016 WL 3981236, at *9; *Kiken*, 155 F.Supp.3d at 606-07 (same); *Genworth*, 103 F.Supp.3d at 785 (same). Unlike in Defendants' cases, *see* MTD at 31, the Complaint ties Defendants' focus on MVF and demand to their knowledge of falsity. *See supra* at 3-5, 7, 9-11, 27, 29.[21]

### 4. The Critical Importance of MVF to Wolfspeed Supports a Strong Inference of Scienter

The alleged fraud concerned Wolfspeed's core operation, which Defendants and analysts repeatedly identified as central to Wolfspeed's profitability and growth. *See id.* at 3-4; ¶¶190-201. That the misstatements concern Wolfspeed's core operations "elevat[es] the plausibility that senior officers" knew the truth, and thus supports scienter. *James River*, 2023 WL 5538218, at *21; *see also Kiken*, 155 F.Supp.3d at 606 ("it is relevant to the Court's holistic analysis whether the alleged fraud dealt with core operations of the business, because high-ranking officers presumably know facts about the core operations of the

---

[21] Defendants' scienter cases are inapposite. MTD at 31; *see DXC*, 19 F.4th at 612 (no scienter "simply...because part of [the company's] business plan was not going smoothly"); *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 549 (4th Cir. 2017) (no scienter based on "executive's use of a single ***possibly ambiguous*** word" on an analyst call mischaracterizing an agreement representing 4.1% of annual revenue) (emphasis in original); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 889 (4th Cir. 2014) ("Fundamentally, the...accounting error itself was not especially obvious, at least with respect to the Company's financial bottom-line.").

company"); *MicroStrategy*, 115 F.Supp.2d at 639 ("Problems with a transaction with a major impact on revenues are more likely to help support a strong evidence of scienter.").

Contrary to Defendants, *see* MTD at 31, the Fourth Circuit in *DXC* "did not per se reject the core-operations theory of scienter[.]" *James River*, 2023 WL 5538218, at *21 (rather, "the [*DXC*] court cautioned against labeling 'broad corporate strategies' as core operations or relying on core-operations allegations ***alone*** to infer scienter....And since [*DXC*], a district court within the Fourth Circuit has cited the decision in inferring scienter ***partially*** based on core operations.") (citing *Sinnathurai*, 645 F.Supp.3d at 524-25 (emphases in original).[22] Here, core-operations allegations supplement Plaintiffs' other scienter allegations. In *James River*, plaintiffs' allegation of "Uber's status as the Company's 'largest account' and 'largest client,' combined with Defendants' statements that they were 'watching' Uber reserves 'very carefully and very closely' and 'doing a deep dive every single quarter,'...elevate[d] Plaintiffs' core-operations allegations above the 'broad corporate strategies' at issue in [*DXC*]." 2023 WL 5538218, at *21.

### 5. Additional Scienter Allegations

Additional allegations further support a strong inference of Defendants' scienter as part of a holistic analysis. First, Lowe's termination in the wake of Defendants' disclosure that MVF widely missed its projected revenue supports a strong inference of scienter. *See Emergent BioSolutions*, 2023 WL 5671608, at *26 n.18; *Cambridge Ret. Sys. v. Jeld-Wen*

---

[22] *See also Yates*, 744 F.3d at 890 (holding that "core operations" allegations "are relevant to the court's holistic analysis of scienter" when accompanied by "additional detailed allegations establishing the defendants' actual exposure" to the relevant issue).

*Holding, Inc.*, 496 F.Supp.3d 952, 967-68 (E.D. Va. 2020). The Complaint alleges "suspicious circumstances," including the timing of Lowe's departure relative to these disclosures (*supra* at 12-13), which "differentiate[s] between a suspicious change in personnel and a benign one." *Phx. Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F.Supp.3d 862, 894 (N.D. Ill. 2023). Defendants argue that executive firings, "without more," are insufficient, MTD at 33, but Plaintiffs allege far more.

Additionally, the pressure Defendants placed on Wolfspeed employees to meet financial targets (¶¶87-104) supports scienter. *See Glazer*, 63 F.4th at 772 ("Plaintiffs' allegations of a company-wide pressure campaign, on their own, are sufficient to raise a strong inference of scienter."). Defendants' suggestion otherwise, *see* MTD at 15, misses the point: the allegations go to scienter, not falsity.[23]

### 6. Plaintiffs' Allegations of Fraud Are at Least as Plausible as Defendants' Non-Fraudulent Explanation

Plaintiffs have alleged a strong inference that Defendants made misstatements and omissions while knowing or recklessly disregarding their falsity. Defendants' alternative theory—that they were "optimistic about the Company's ability to meet aggressive financial goals and weather a market downturn, and then reduced those estimates as soon as it became apparent the Company could not meet them" (MTD at 26)—is not more compelling.

---

[23] Wolfspeed's corporate scienter is established through Plaintiffs' showing as to its senior executives. *See Kiken*, 155 F.Supp.3d at 606 (scienter of one authorized agent of the corporation suffices). Because Lowe and Reynolds knew or recklessly disregarded information contrary to Wolfspeed's public statements, their scienter is imputed to the Company.

Defendants' opposing inference ignores Plaintiffs' allegations that Defendants: (1) had a concrete motive to misstate MVF's utilization in order to reduce or eliminate the Secured Notes' $500 million cash-maintenance requirement at a time when the Company was teetering on bankruptcy; (2) received, or at least had access to, reports directly contradicting their statements about utilization and demand; (3) repeatedly spoke about MVF utilization while Lowe personally monitored progress; and (4) touted MVF as Wolfspeed's core operation. Viewed holistically, Plaintiffs' inference of scienter is at least as compelling, if not more so, than Defendants' competing inference. *See Kiken*, 155 F.Supp.3d at 606 (finding "the following factors, taken together, are sufficiently probative of scienter: (1) that a defendant's allegedly fraudulent conduct involved 'core operations' of the business; (2) defendants' positions and level of personal involvement within the company; (3) statements regarding compliance; and (4) motive and opportunity of corporate officers.") (citing *Genworth*, 103 F.Supp.3d at 783–87).[24]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied. Should the Court find the Complaint to be deficient in any respect, Plaintiffs respectfully request leave to amend. *See Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 651 (4th Cir. 2007) ("Rule 15(a) instructs that leave to amend shall be freely given when justice so requires.").

---

[24] Defendants' sole challenge to Plaintiffs' §20(a) control-person-liability claim is that Plaintiffs failed to sufficiently allege primary liability. MTD at 34. Because Plaintiffs have properly alleged a §10(b) claim, the §20(a) claim should be upheld. *See 3D Systems*, 2016 WL 3981236, at *12.

- 34 -

DATED:  April 21, 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN*
ALAN I. ELLMAN*

/s/ Alan I. Ellman
ALAN I. ELLMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
CRISTELLE RABBAN*
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
crabban@rgrdlaw.com

POMERANTZ LLP
JEREMY A. LIEBERMAN*
MICHAEL J. WERNKE*
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone:  212/661-1100
jalieberman@pomlaw.com
mjwernke@pomlaw.com

BRONSTEIN, GEWIRTZ
  & GROSSMAN, LLC
PERETZ BRONSTEIN*
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212/697-6484
peretz@bgandg.com

*Counsel for Lead Plaintiffs and Plaintiff
William Maizner*

- 35 -

SCHILLER & SCHILLER PLLC
DAVID G. SCHILLER (NC Bar No. 26713)
304 E. Jones Street
Raleigh, NC  27601
Telephone:  919/789-4677
david@schillerfirm.com

*Local Counsel for Lead Plaintiffs and Plaintiff William Maizner*

HAO & HAN LAW FIRM
JUNBO HAO**
Room 3-401 No. 2 Building,
No. 1 Shuangliubei Street
100024 Beijing
People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

*Additional Counsel for Lead Plaintiffs Qiu Shaomei, He Jie, Cai Guangjian*

* Notice of Special Appearance filed pursuant to L.R. 83.1(d)

** Notice of Special Appearance forthcoming

- 36 -

## CERTIFICATE OF WORD COUNT

I hereby certify that the foregoing memorandum of law complies with the formatting and word-count limitations pursuant to Local Rule 7.3(d)(1) of the Rules and Procedure of the United States District Court for the Middle District of North Carolina, and this Court's February 19, 2025 Order granting a word limitation extension, because it contains 8,991 words.

/s/ Alan I. Ellman
ALAN I. ELLMAN

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Alan I. Ellman
ALAN I. ELLMAN