IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GARY ZAGAMI, Individually and )
on Behalf of All Others Similarly )
Situated, )
)
Plaintiff, )
) 1:26-cv-18
v. )
)
WOLFSPEED, INC., et al., )
)
Defendants. )

### MEMORANDUM OPINION AND ORDER

Lindsey A. Freeman, United States District Judge.

Lead plaintiffs Syed Alam, Cai Guagjian, He Jie, and Qiu Shaomei (collectively, "Plaintiffs") bring this putative securities class action against Wolfspeed, Inc. ("Wolfspeed" or the "Company") and two of its former corporate officers, Gregg Lowe ("Lowe") and Neill Reynolds ("Reynolds," and, collectively with the other defendants, "Defendants"). They assert that Defendants defrauded investors by falsely touting the successful ramp-up of Wolfspeed's new production facility in New York and overexaggerating the strength of demand for the Company's products. Although Wolfspeed's public statements of corporate optimism ultimately did not come to bear, "not every financial disappointment is actionable under federal law." *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 237 (4th Cir. 2023). As the Fourth Circuit has found, "liability for securities fraud should not be predicated solely on an

overly optimistic view of a future which may, in fact, encounter harsh economic realities down the road." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017). Here, Plaintiffs do not carry their burden to plead a violation of the Securities Exchange Act of 1934 ("Securities Exchange Act") under the heightened pleading standards articulated by the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b). Because their allegations of scienter are either conclusory or outweighed by the competing inference that the Defendants were optimistic about a future that did not materialize, Plaintiffs' amended complaint will be DISMISSED WITHOUT PREJUDICE.

## FACTS AND PROCEDURAL HISTORY

Wolfspeed, formerly known as Cree, Inc., is headquartered in Durham, North Carolina, and focuses on the development and manufacturing of silicon carbide for use in electric vehicles, renewable energy systems, industrial equipment, data centers, and aerospace applications. Dkt. 57 ("Amended Complaint") ¶¶ 23, 29.[1] A publicly-traded company, its stock trades on the New York Stock Exchange under the ticker symbol "WOLF." *Id.* ¶ 23. During the relevant time-period—between August 16, 2023, and November 6, 2024 (the "Class Period")—Lowe and Reynolds served as CEO and CFO of Wolfspeed, respectively. *Id.* ¶¶ 2, 24-25.

---

[1] The Court's citations to the docket refer to those filings' internal paragraph or page numbers.

Prior to the Class Period, Wolfspeed manufactured silicon carbide primarily out of a production facility near its Durham, North Carolina headquarters. *Id.* ¶ 30. But with the proliferation of electric vehicles, Wolfspeed determined that demand for silicon carbide had outstripped its pace of production in Durham. *See id.* ¶¶ 31-33; *see also* Dkt. 101-1 at 7.[2] As a result, on April 25, 2022, Wolfspeed announced that it had launched the project that would hopefully catapult the Company to the forefront of the silicon carbide industry: the Mohawk Valley Silicon Carbide Fabrication Facility ("MVF"), located in Marcy, New York on the campus of the State University of New York Polytechnic Institute. *See* Amended Complaint ¶¶ 19, 31. Concurrently, Wolfspeed transitioned away from producing 150-milimeter silicon carbide wafers to thicker 200-milimeter wafers, Dkt. 101-1 at 5; Dkt. 101-2 at 5, touting MVF as the world's largest 200-milimeter silicon carbide fabrication facility, Amended Complaint ¶ 31.

---

[2] The Court may take judicial notice of "relevant Securities and Exchange Commission [("SEC")] filings and other publicly available documents included in the record," such as analyst reports, earnings-call transcripts, and investor-conference transcripts. *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021); *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 550-51 (M.D.N.C. 2018) (collecting cases). For that reason, the Court will take judicial notice of the various SEC filings, earnings-call transcripts, investor-conference transcripts, and analyst reports that are referenced and quoted in the Amended Complaint.

Wolfspeed announced in April 2023 that it intended to reach a rate of 20% utilization[3] at MVF by June 2024—a little more than two years after opening the facility. *See id.* ¶ 7. By early 2023, Wolfspeed told investors about growing pains and delays with MVF, announcing one-quarter ramp delays in January and April 2023. *See id.* ¶¶ 37, 42. In August 2023, Reynolds revised the Company's previous guidance, touting that MVF was still on-track to reach 20% utilization by June 2024 despite the prior delays. *See* Amended Complaint ¶ 106. Lowe and Reynolds still acknowledged that the Company anticipated further growing pains as it continued to ramp MVF, however. *See, e.g.,* Dkt. 101-1 at 8-9, 10, 12. The pair continued to echo their cautious optimism about the project in October 2023 and January 2024, highlighting MVF's solid ramp but emphasizing that "ramp [would] not be linear" and that the Company would experience a lag period between ramp and realizing revenues from the project. *See* Dkt. 101-2 at 8-9; Dkt. 101-3 at 5. At the same time, the pair told investors that based on what they were seeing from MVF, they were confident that MVF would reach the Company's financial targets. *See* Amended Complaint ¶¶ 130, 133, 136.

The Company also updated investors about demand for its products early on during the Class Period. Wolfspeed expected that a national transition from combustion

---

[3] MVF's "utilization rate" compares the current number of wafer starts per week at the facility to the number of wafer starts expected when MVF is operating at its optimized level. *See* Dkt. 101-11 at 2. So, 20% utilization would mean that MVF was producing 20% of the wafers that Wolfspeed expected the factory to produce when fully operational.

4

engine vehicles to electric vehicles would radically reshape the car industry and Wolfspeed's business with it. *See* Dkt. 101-4 at 10. Throughout the Class Period, Wolfspeed reported strong demand for silicon carbide from its electric vehicle customers, *see, e.g.*, Amended Complaint ¶¶ 134, 136, 147, 170, 233-34, although it acknowledged as early as January 2024 that industry-wide industrial and energy demand was "definitely weak" and described the market transition to electric vehicles as "happening at a more modest pace than previously anticipated," Dkt. 101-3 at 5, 12. With these caveats, Reynolds explained in January 2024 that demand for Wolfspeed's products "continue[d] to remain strong based on the customers that we have in front of us," with Lowe adding that the Company's "diverse customer base across the global electric vehicle industry … gives us confidence to continue with our expansion plan[.]" Amended Complaint ¶¶ 233-34. According to Lowe, these factors "further illustrate[d] why we believe our supply will be continuing to work to catch up with demand over the next few years." *Id.* ¶ 233.

Based on interviews with two anonymous former employees ("FE1" and "FE2"), Plaintiffs allege that it became clear to the Company in early 2024 that MVF was not hitting its utilization targets, despite the Company's optimistic public disclosures. *See id.* ¶¶ 54, 57-58. FE2, who joined Wolfspeed as a financial analyst in February 2024,[4] stated

---

[4] The Amended Complaint curiously omits *where* FE2 worked, although based on his reporting tree listed in the Amended Complaint, *see* Amended Complaint ¶ 56, the

that it became clear to him[5] as soon as he joined the Company that MVF was not hitting its targets, although "he did not remember exactly where MVF was in reaching 20% utilization during his tenure at Wolfspeed[.]" *Id.* ¶¶ 55, 57. FE1, who worked in Durham as a director in Wolfspeed's accounting department between June 2023 and September 2024, concurred that "everyone knew we weren't hitting the number," referring to Wolfspeed's target of 20% utilization. *Id.* ¶¶ 52, 58. He added that based on his own review of the Company's finances through his accounting work, the Company's public disclosures did not add up. *See id.* ¶¶ 58-60.

FE2 further avers that demand for Wolfspeed's products "fell off a cliff" in February 2024. *Id.* ¶ 63. According to FE2, the Company's demand lagged across all sectors, with the electric vehicle sector being especially acute. *Id.* The FEs based their understanding of demand on their review of Wolfspeed's internal profit and loss ("P&L") reports and conversations with sales team members, who characterized the Company's sales goals as "unrealistic." *Id.* ¶¶ 64-65. FE1 stated that figures revealing declining demand were contained in a monthly "final rollup" budget, which he understood "would go to Lowe and Reynolds." *Id.* ¶ 69. According to FE1, by January or February 2024,

---

reasonable inference is that he worked at Wolfspeed's headquarters in Durham. Further, Plaintiffs' counsel conceded during oral arguments that FE2 did, in fact, work in Durham. *See* Hr'g Tr. 46:14-47:3.

[5] The Amended Complaint uses masculine pronouns when referring to the FEs to protect their identities. Amended Complaint ¶ 58 n.3. The Court will follow suit.

there were "a lot of concerns around softening demand" generally throughout the Company. *Id.* ¶ 67.

In May 2024, Wolfspeed reported as-scheduled ramp at MVF and re-emphasized strong demand. Critically, the Company announced that MVF had reached "more than 16% utilization," making management "extremely confident" that MVF would reach the 20% utilization target set for June. *Id.* ¶ 146. Lowe and Reynolds also reiterated that demand for Wolfspeed's products continued to outpace supply. *See id.* ¶¶ 236-38.

According to Plaintiffs, the market began to develop awareness of Defendants' alleged fraud beginning in June 2024. On June 20, 2024, *Reuters* published an article reporting on Wolfspeed. *Id.* ¶ 157. That articled revealed to investors that the Company had delayed construction of a new facility in Germany and reduced spending amid weakness in the United States and European electric vehicle markets. *Id.* The market reacted poorly to the news, and Wolfspeed's stock dropped about 8.6% in response. *Id.* ¶ 159. That is so, Plaintiffs allege, because the article "partially revealed that demand for Wolfspeed's products as well as the Company's current and future financial condition and growth prospects may not have been as Defendants had been representing." *Id.* ¶ 259.

The FEs largely echo that demand struggles materialized more acutely around June 2024. *See id.* ¶ 69. FE1 reported that "you could feel the pressure" by June 2024 because sales had begun to fall rapidly across the board at Wolfspeed. *Id.* FE2 attributed

the sharp decline to three factors: (1) Wolfspeed had miscalculated the United States demand for electric vehicles; (2) Chinese companies were undercutting Wolfspeed by producing similar quality products for a fraction of the price; and (3) the market began to disbelieve Wolfspeed's claims about the superiority of its products and manufacturing process. *Id.* ¶¶ 70-72. FE2 intimated that Lowe or Reynolds must have known about declining demand given various alarms raised by largely unspecified employees. *See id.* ¶¶ 74-75. He added that he sent weekly reports indicating declining demand to the vice-president level of the Company, stating that those reports were "definitely sent to the chain of employees underneath Lowe and Reynolds." *Id.* ¶ 76 (quotation modified).

Four days after the *Reuters* article, on June 24, 2024, Wolfspeed announced that MVF had reached 20% utilization as planned. *See* Dkt. 101-11 at 1; *see also* Amended Complaint ¶ 161. The press release contained a statement from Lowe touting that Wolfspeed was "well-positioned to continue executing our 200mm vertical integration strategy ahead of other market participants." Amended Complaint ¶ 161. And the Company characterized its achievement as "a critical step in the Company's efforts to meet the growing demand for silicon carbide power devices." *Id.* Wolfspeed further announced a new target of 25% utilization at MVF by the end of 2024. *Id.* ¶ 162.

According to the FEs, Wolfspeed's June 2024 press release was a lie. FE1 stated that he "never saw" 20% utilization reflected in the Company's internal reporting. *Id.* ¶ 60. He explained that even when he left Wolfspeed in September 2024, MVF's

8

utilization was "only at like 10%." *Id.* He added that "there was a lot of pressure on the local team in New York about not hitting the 20% utilization rate," although he does not specify the source of that pressure. *See id.* FE2 agreed that by June 2024 production at MVF was "far behind where they expected to be." *Id.*

There was more bad news to come. In August 2024, Wolfspeed reported quarterly losses and revenue below analyst expectations. *Id.* ¶ 165. It further announced plans to close its Durham production facility as part of Company-wide cost-cutting efforts. *Id.* And although Lowe touted the Company's continued capacity to ramp MVF and strong revenues from the electric vehicle market, *id.* ¶¶ 170-71, he disclosed that "the ramp of [electric vehicles] is slower than previously projected and many companies in the semiconductor industry are still confronting automotive headwinds," Dkt. 101-5 at 5. Despite the poor August announcements, Lowe reiterated the strength of MVF in September 2024 by pointing to the Company's disclosures on June 24, 2024, as evidence of MVF's strong capacity for continued ramp. *See* Amended Complaint ¶¶ 177-78.

By November 2024, the walls came crashing down. On November 6, 2024, Wolfspeed revised quarterly revenues downward by 30-50%, attributing the revision to "lower than originally anticipated market demand and customer pushouts." *Id.* ¶¶ 15, 181. It also announced the closure of two more fabrication facilities, suspended construction of another, and revenues from MVF that Plaintiffs contend are not in step with revenue projections expected of the factory if it had, indeed, reached 20% utilization.

*See id.* ¶¶ 181-88; *see also* Dkt. 112 at 13. Wolfspeed's stock price tumbled by 39.2%. Amended Complaint ¶ 186. And around two weeks later, Wolfspeed announced that its board of directors had reached an agreement with Lowe to depart from the Company. *Id.* ¶¶ 246-48. This action followed suit.

This consolidated action was originally filed in the United States District Court for the Northern District of New York as three separate lawsuits. *See generally* Dkt. 34. The first plaintiff to file, Gary Zagami, filed his complaint on November 15, 2024. *See generally* Dkt. 1. The other two lawsuits, filed by William Maizner and Luis Ferreira on January 8, 2025, and January 13, 2025, respectively, followed quickly behind. *See* Dkt. 34 at 1. On February 24, 2025, the Northern District of New York consolidated the three actions, appointing Plaintiffs lead plaintiffs and the law firms Pomerantz LLP and Robbins Geller Rudman & Dowd LLP co-lead counsel. *Id.* at 6. Plaintiffs filed the now-operative Amended Complaint on May 5, 2025. *See generally* Amended Complaint. The Amended Complaint asserts that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC") by: (1) overexaggerating the pace of MVF's ramp, its current and projected utilization rates, and its actual and projected revenues; and (2) falsely disclosing to investors that demand for Wolfspeed's products was "strong." *See id.* ¶¶ 4-16; *see also* Dkt. 112 at 15-21.

In June 2025, Defendants moved the Northern District of New York to transfer the case to this District. *See* Dkt. 59. While that motion was pending, Wolfspeed filed for and emerged from Chapter 11 bankruptcy. *See* Dkts. 63, 66. Magistrate Judge Mitchell J. Katz of the Northern District of New York granted Defendants' motion on December 22, 2025, and ordered the consolidated action transferred to this District. *See* Dkt. 76.

Following the transfer, Defendants moved to dismiss the Amended Complaint, Dkt. 100, and the parties briefed the merits of that motion, Dkts. 104, 112, 114. The Court held oral arguments on Defendants' motion on July 20, 2026. *See* 07/20/2026 Minute Entry. Defendants' motion is therefore ripe for this Court's disposition. For the reasons outlined below, the Court GRANTS Defendants' motion to dismiss.

## STANDARDS OF REVIEW

When reviewing a motion to dismiss a securities-fraud complaint, the Court must "accept all factual allegations in the complaint as true" and "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). And, like all complaints reviewed under Rule 12(b)(6), the Court must draw "all reasonable inferences" in Plaintiffs' favor. *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021).

But securities-fraud plaintiffs "face heightened pleading requirements" above and beyond the ordinary plausibility standards of Rule 12(b)(6). *Syneos*, 75 F.4th at 240

(internal quotations omitted); *Emps.' Ret. Sys. of Baton Rouge & Parish of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 381-82 (4th Cir. 2023); *see also Tchrs.' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 170-73 (4th Cir. 2007) (explaining the heightened pleading requirements for securities fraud and their interaction with the general pleading requirements).[6] Namely, plaintiffs must satisfy the particularity requirements for fraud found in Rule 9(b) and certain additional particularity requirements contained within the PSLRA. *See Hunter*, 477 F.3d at 171-72; *see also* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1)-(2). The former requires that a plaintiff "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The latter obligates securities plaintiffs to specifically identify misstatements and omissions and state with particularity why plaintiffs believe them to be misleading. 15 U.S.C. § 78u-4(b)(1) ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity *all facts* on which that belief is formed." (emphasis added)). Plaintiffs also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2). These heightened

---

[6] This is not the first time that Wolfspeed has been sued in this District for alleged securities fraud. Prior to changing its name from Cree, Inc., Wolfspeed was sued in another putative securities class-action a little over two decades ago. *See generally In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461 (M.D.N.C. 2004). After then-Judge Frank W. Bullock granted Wolfspeed's motion to dismiss that action with prejudice, *see In re Cree, Inc. Sec. Litig.*, No. 1:03-cv-549, 2005 WL 1847004, at *16 (M.D.N.C. Aug. 2, 2005), the plaintiffs appealed. A divided panel of the Fourth Circuit affirmed Judge Bullock's dismissal of that securities-fraud complaint in *Hunter*. *See* 477 F.3d at 168.

12

pleading standards require that plaintiffs "establish the who, what, when, where, and how of the alleged fraud that underlies their claims." *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 539 (M.D.N.C. 2013) (internal quotations omitted). Undoubtedly that burden is high—designedly so—because the PSLRA stands "[a]s a check against" what Congress viewed as "abusive litigation by private parties" in securities-fraud cases. *Tellabs*, 551 U.S. at 313.

## ANALYSIS

Plaintiffs fail to meet their burden to plead violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated by the SEC. *See* 15 U.S.C. §§ 78j(b), 78t(a)-(b); 17 C.F.R. § 240.10b-5. Section 10(b) makes it unlawful "to use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). And Rule 10b-5 implements Section 10(b) by prohibiting regulated parties from "mak[ing] any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

Defendants levy several reasons for dismissing all or some of the Amended Complaint, but it is sufficient for the Court to address only one basis for dismissal—

13

scienter—because "the failure to adequately allege scienter is enough to doom [a] claim."

*KBC*, 19 F.4th at 607.[7]  Plaintiffs fail to plead facts with sufficient particularity to allow the Court to draw the "strong inference" that the Defendants acted with the required state of mind when they issued the allegedly false or misleading public statements at the center of this case because any inference of scienter is outweighed by the competing inference that Defendants were optimistic about a future that did not, in fact, come to bear.  *See* 15 U.S.C. § 78u-4(b)(2).

Plaintiffs' claims thus fail under the second element of a securities-fraud claim, scienter.  To state a claim under Section 10(b) of the Securities Exchange Act, a plaintiff must plead all of the following elements: (1) a "material misrepresentation or omission" by the defendants; (2) a culpable mental state, otherwise known as "scienter;" (3) a "connection between the misrepresentation or omission and the purchase or sale of a security;" (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the plaintiff's economic loss, or "loss causation."  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).  To establish the second element, scienter, a plaintiff needs to adequately

---

[7] Defendants also move to dismiss some of the alleged misstatements or omissions on the ground that they were not false when issued or else inactionable forward-looking statements, puffery, or statements of opinion.  *See* Dkt. 104 at 9-26.  Because the elements of a securities-fraud claim under Section 10(b) "can be addressed in any order," the Court need not address Defendants' alternative grounds for dismissal.  *See KBC*, 19 F.4th at 607.

14

plead "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (internal quotations omitted). Allegations that the defendants acted intentionally or severely recklessly as to the truth or falsity of the alleged misstatements or omissions are sufficient in most instances to establish scienter. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014). Severe recklessness "is, in essence, 'a slightly lesser species of intentional misconduct.'" *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 344 (4th Cir. 2003) (quoting *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)); *see also Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999) (defining deliberate recklessness).[8]

There is no one-size-fits-all approach to determining whether a specific securities-fraud complaint pleads a "strong inference" of scienter because "[e]valuating the strength of an inference is necessarily a comparative inquiry." *See Yates*, 744 F.3d at 885. An inference of scienter can be fairly characterized as "strong" when it is at least as compelling as "the opposing inferences that may be drawn from the facts in their entirety." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 624 (4th Cir. 2008); *see also City of*

---

[8] When plaintiffs challenge forward-looking statements, severe recklessness will not suffice because the PSLRA requires that they allege that the statements were made "with actual knowledge" of their falsity. *See* 15 U.S.C. § 78u-5(c)(1)(B); *see also MacroGenics*, 61 F.4th at 389; *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010). Defendants contend that many of the alleged misstatements are forward-looking and that Plaintiffs fail to plead actual knowledge of their falsity. *See* Dkt. 104 at 23. It is unnecessary to assess whether the statements are forward-looking because Plaintiffs fail to plead even the lesser mental state of severe recklessness.

*Southfield Gen. Emps.' Ret. Sys. v. Advance Auto Parts, Inc.*, 167 F.4th 637, 646 (4th Cir. 2026). Accordingly, "if the more compelling inference is that the defendants acted innocently—or even negligently"—the Court must dismiss the Amended Complaint. *Cf. Advance Auto Parts*, 167 F.4th at 646; *see also Tellabs*, 551 U.S. at 314 (an inference of scienter is not "strong" if it is "merely plausible or reasonable").

In conducting its analysis, the Court's "job is not to scrutinize each allegation in isolation but to assess the allegations holistically." *Tellabs*, 551 U.S. at 326. Nonetheless, it begins by assessing the allegations individually before considering the allegations together. *Advance Auto Parts*, 167 F.4th at 647. And Plaintiffs "may not stack inference upon inference to satisfy the [PSLRA's] pleading standard" because a strong inference of scienter must "be supported by facts, not other inferences." *Id.* at 648 (internal quotations omitted).

Scienter also must be pleaded as to each misstatement or omission and each individual and/or corporate defendant. *See* 15 U.S.C. § 78u-4(b)(2)(A) (required mental state must be alleged as to "each act or omission alleged"); *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 189-90 (4th Cir. 2009) (plaintiff must allege particular facts supporting that each named defendant acted with scienter). When the defendant is an individual, the complaint must support the strong inference that he personally acted with the required mental state. *Matrix*, 576 F.3d at 190. As to a corporate defendant, the plaintiff "must allege facts that support a strong inference of scienter with respect to at

16

least one authorized agent of the corporation, since corporate liability derives from the actions of its agents." *Hunter*, 477 F.3d at 184.

Plaintiffs fail to allege securities fraud because they do not establish the required scienter as to any Defendant concerning any of the alleged misstatements or omissions. The Court agrees with Defendants that "[e]ven when taken together 'the more compelling inference' is that Defendants were optimistic about [Wolfspeed's] ability to meet aggressive financial goals and weather a market downturn, and then reduced those estimates as soon as it became apparent the Company could not meet them." Dkt. 104 at 26; *see also Advance Auto Parts*, 167 F.4th at 646. For analytical simplicity, the Court groups the alleged misstatements in this case into two categories: (1) statements regarding MVF ramp, utilization rates, and revenues; and (2) statements concerning demand for Wolfspeed's products. *See* Dkt. 104 at 12-18; Dkt. 112 at 18-21. It also assesses whether scienter has been alleged as to each of the Defendants.

The Court begins with statements regarding MVF's ramp-up, utilization rates, and revenues before concluding with an analysis of the statements concerning demand for Wolfspeed's products. It ultimately concludes that Plaintiffs have failed to allege scienter as to either category of misstatements when those allegations are viewed holistically. As

a result, Plaintiffs' claims under Sections 10(b) and 20(a) of the Securities Exchange Act fail.[9]

**I.      Plaintiffs Do Not Plead a Strong Inference of Scienter as to the Statements Concerning MVF.**

Plaintiffs assert various theories as to why they have adequately pleaded scienter as to the misstatements concerning MVF ramp, utilization rates, and revenues, but even considered holistically they fail to state a claim.  Plaintiffs highlight the following allegations in the Amended Complaint to assert a purported strong inference of scienter as to some or all Defendants:

(1) Defendants were motivated to lie about MVF utilization rates to improve Wolfspeed's liquidity position by reducing debt covenants contained in secured notes held by creditors, Amended Complaint ¶¶ 189, 252-55;

(2) Lowe and Reynolds had access to internal documents revealing low MVF utilization rates and revenues, *id.* ¶¶ 54, 69, 75-77, 85, 202-13;

(3) Lowe's own public statements reveal that he had access to information contradicting those public statements, *id.* ¶¶ 190-201, 214-18;[10]

---

[9] Section 20(a) is merely a "vehicle for imposing liability on control persons," such as Lowe or Reynolds.  *See R.I. Off. of Gen. Treasurer ex rel. Emps. Ret. Sys. of R. I. v. Boeing Co.,* __ F.4th __ , 2026 WL 2083048, at *5 (4th Cir. July 20, 2026) (internal quotations omitted). Section 20(a) liability is derivative of and wholly dependent upon the liability of a controlled person under Section 10(b), which, in this case, is Wolfspeed.  *See id.*  Put simply, Plaintiffs' Section 20(a) claim "rises and falls with their [S]ection 10(b) claim." *Id.*

[10] Plaintiffs further point to Lowe's public statements that allegedly reveal his frustration that the market was not adequately valuing Wolfspeed's stock, *see* Amended Complaint ¶¶ 214-18, but they do not address these allegations in their opposition brief.  Plaintiffs' counsel confirmed during oral arguments that they are abandoning these allegations.  *See* Hr'g Tr. 65:6-18.  As a result, the Court does not address them.

18

(4) MVF was so central to Wolfspeed's business that senior officers would likely have received information concerning its poor position, *id.* ¶¶ 190-201;

(5) MVF experienced numerous delays prior to the Class Period, but then suddenly experienced an operational turnaround during the Class Period after investors questioned the success of the project, *id.* ¶¶ 219-31; and

(6) Wolfspeed terminated Lowe soon after the alleged fraud was revealed to the marketplace, *id.* ¶¶ 246-51.

The Court addresses Plaintiffs' allegations in turn, rejecting each individually and then holistically. Individually, all the allegations that Plaintiffs highlight are either impermissibly generalized to Wolfspeed as a corporate entity, conclusory, or amount to pleading fraud by hindsight.[11] Even collectively, the allegations fail to build a strong inference that any of the Defendants acted with even recklessness as to the falsity of their public statements concerning MVF ramp, utilization, or revenues. As a result, the relevant misstatements will be dismissed.

### A. Wolfspeed's liquidity covenants do not support an inference of motive.

Plaintiffs have not pleaded facts indicating that Defendants were motivated to defraud investors to improve the Company's liquidity position. Plaintiffs specifically allege the following: (1) in June 2023 Wolfspeed sold $1.25 billion in senior secured notes to creditors; (2) those secured notes contained a financial covenant requiring that the

---

[11] "Fraud by hindsight refers to allegations that assert no more than that because something eventually went wrong, defendants must have known about the problem earlier." *Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008).

Company maintain at least $500 million in unrestricted cash or cash equivalents at the end of each month; and (3) that cash-liquidity covenant would be reduced to $325 million after MVF reached 30% utilization over a six-month period and become $0 when MVF reached 50% utilization over a six-month period. Amended Complaint ¶¶ 252-55. Plaintiffs contend that these allegations state "a particularized motive to misstate MVF's utilization rate" because the liquidity covenants "created a direct financial incentive for Wolfspeed" to defraud investors. Dkt. 112 at 26.

While Plaintiffs' theory is relatively straightforward, it is nothing more than the sort of generalized corporate motive that is not probative of scienter as a matter of law. *See Yates*, 744 F.3d at 891 ("financial motivations common to every company," including "avoid[ing] a default on loan covenants," do not support a strong inference of scienter). To Plaintiffs' credit, the Court agrees that Wolfspeed's liquidity position with creditors would have improved if MVF reached 30% or 50% utilization, providing "concrete benefits [to Wolfspeed specifically] that could be realized by one or more of the false statements." *Ottmann*, 353 F.3d at 352 (internal quotations omitted). But a corporate desire to achieve that tangible benefit is "a general motive shared by *all corporate officers and directors*" of Wolfspeed, rather than Lowe or Reynolds, so it is "no more probative of [their] scienter than of other less-culpable states of mind[.]" *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 643 (E.D. Va. 2000) (emphasis added); *see also In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 693-94 (D. Md. 2018) (declining to infer motive from

20

allegations that defendants were motivated to preserve company's debt rating ahead of bond offering where allegations were not "sufficiently particular as to" the individual defendants); *Patel v. L-3 Commc'ns Holdings Inc.*, No. 14-cv-6038, 2016 WL 1629325, at *11 (S.D.N.Y. Apr. 21, 2016) (declining to infer scienter from allegation that defendants were motivated to defraud after public debt offering because plaintiffs did not allege "facts indicating that the debt-offering provided a personal, concrete benefit" to any individual defendant); *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 476 (M.D.N.C. 2004) (allegation that company was motivated to ensure its "secondary stock offering was successful" was only "attributable to corporate officers generally," so it was "insufficient [by itself] to establish scienter").

Plaintiffs do nothing to particularize this generalized motive to Lowe or Reynolds. *See Hunter*, 477 F.3d at 184. Instead, the Amended Complaint vaguely asserts that the notes "created an additional motive for *Defendants* to inflate the MVF utilization rate[.]" Amended Complaint ¶ 255 (emphasis added). Plaintiffs' allegation is insufficient because it would require the Court to speculate as to any individual motive for Lowe or Reynolds. *See Inst'l Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 279 (3d Cir. 2009) ("Corporate officers always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud."); *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 560-61 (M.D.N.C. 2018) ("Every for-profit company is motivated by financial gain in our free enterprise system."). Even the cases that Plaintiffs cite in support

21

of their position required more particularized motive to individual defendants. *See MicroStrategy*, 115 F. Supp. 2d at 643, 649 (allegations that the company was motivated to "meet specific credit agreements with lenders" *in conjunction with* additional allegations that individual defendants profited from insider trading and inflated certain stock offerings adequately pleaded scienter); *Burt v. Maasberg*, No. ELH-12-0464, 2014 WL 1291834, at *2, *22-23 (D. Md. Mar. 28, 2014) (plaintiffs adequately pleaded motive to defraud where they alleged that the individual defendants would *personally* retain $180 million in non-taxable net operating losses by concealing their intent to garner a controlling share of the target company prior to a merger); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004) (allegations that *individual defendants* had specific motive to forestall company's loan default was "suggestive" of scienter, even if it did not plead a "strong inference" on its own).

As a fallback position, Plaintiffs argue that an inference of motive is "even stronger" in this case "given Wolfspeed's liquidity constraints amidst its fraught financial situation" as evidenced by its later bankruptcy. *See* Dkt. 112 at 26. But the Amended Complaint contains no allegations regarding Wolfspeed's bankruptcy following the Class Period. Although Defendants concede that Wolfspeed did, in fact, file for bankruptcy on June 30, 2025, *see* Dkt. 104 at 7; *see also* Dkt. 63, that fact alone does nothing to help Plaintiffs. Indeed, Plaintiffs effectively argue that because Wolfspeed *later* filed for bankruptcy it must have *previously* been on the verge of bankruptcy during the Class

22

Period, so, therefore, Lowe and Reynolds must have *been aware of and lied about* Wolfspeed's poor financial position to stave off that later bankruptcy. That sort of argument is foreclosed by Fourth Circuit precedent twice over. It is backwards-looking and requires several speculative inferential steps to reach the conclusion that Plaintiffs urge. *See In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 753 (4th Cir. 2021) (securities plaintiffs may not plead fraud by hindsight); *Advance Auto Parts*, 167 F.4th at 648 (a "strong inference of scienter must be supported by facts, not [further] inferences" (internal quotations omitted)); *see also In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 662 (D. Md. 2000) (pointing to a company's bankruptcy soon after public statements of optimism as evidence that the optimistic statements were fraudulent is "a classic example of pleading 'fraud by hindsight'").

Plaintiffs' theory suffers from a logical flaw, as well. If Defendants were truly motivated to defraud investors to achieve the utilization rates necessary to reduce their debt covenants, why would they not have announced utilization rates during the Class Period *necessary to reduce their debt covenants*? According to the Amended Complaint, Defendants never announced actual MVF utilization rates during the Class Period above 20%. *See, e.g.*, Amended Complaint ¶ 161. It is true that Defendants stated in August and September 2024 that Wolfspeed intended to reach 30% utilization by March 2025. *See id.* ¶¶ 169-70, 177. But if Defendants were, in fact, defrauding investors in a desperate attempt to increase Wolfspeed's liquidity position "amidst its fraught financial situation"

23

to stave off the Company's impending bankruptcy, as Plaintiffs contend, Dkt. 112 at 26, it seems more likely that Defendants would have announced during the Class Period a utilization rate *actually capable* of reducing the Company's debt covenants. But the Amended Complaint makes no such allegation.

Thus, Plaintiffs do not plead motive. While the absence of motive "is not fatal" to Plaintiffs claims, the Court "cannot ignore this omission" when considering the remaining allegations because the factor "weighs heavily against" Plaintiffs "in the scienter analysis." *Syneos*, 75 F.4th at 242 (quoting *Triangle Cap.*, 988 F.3d at 752) (quotation modified).

### B. Plaintiffs do not connect internal reporting processes to Lowe or Reynolds.

Plaintiffs next contend that they adequately allege that Lowe and Reynolds had access to internal documents that contradicted their public statements concerning MVF ramp, utilization, and revenue. *See* Dkt. 112 at 27-30. As is the norm in securities cases, Plaintiffs allegations on this front are entirely supported by the FEs. *See, e.g.*, Amended Complaint ¶¶ 202-13. To meet the heightened pleading requirements of the PSLRA, a plaintiff "may rely on confidential sources to substantiate his claims for securities fraud." *Cree*, 333 F. Supp. 2d at 472. But "such allegations will only be afforded the weight they are due given their indicia of reliability." *Advance Auto Parts*, 167 F.4th at 649 (quoting *KBC*, 19 F.4th at 609). The Court considers a number of factors when weighing the strength of a confidential witness's allegations, including "the level of detail provided by

24

the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, [and] the reliability of the sources." *Cree*, 333 F. Supp. 2d at 472 (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002)).  Here, FE1 and FE2 fail to connect the reports to Lowe or Reynolds, instead speculating that "there's no way" the pair "couldn't have known" about the information contained in the reports because it was the FEs' "understanding" that Lowe and Reynolds reviewed internal reports.  Amended Complaint ¶¶ 57, 69, 75.  Because these statements are little more than conclusory assertions, the FEs' allegations are entitled to little weight.  *See KBC*, 19 F.4th at 609 (allegations from confidential witnesses in securities cases "will only be afforded the weight they are due given their indicia of reliability").

A securities plaintiff may build a strong inference of scienter through specific allegations that a defendant reviewed or had access to internal documents which contradicted his contemporaneous public statements.  *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000); *see also In re SolarEdge Techs., Inc. Sec. Litig.*, No. 1:23-cv-9748, 2025 WL 1031154, at *12-13 (S.D.N.Y. Apr. 6, 2025) (specific allegations that individual defendants reviewed frequent reports on the company's financial position contradicting their public statements, coupled with public statements acknowledging information allegedly contained in the reports, supported strong inference of scienter).  Plaintiffs must specifically allege *both* that the reports contained specific information contrary to

25

Defendants' public statements *and* that they were accessible to the Defendants. *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 792 (S.D.N.Y. 2020); *see also In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 406-07 (S.D.N.Y. 2016) (allegations that defendants "must" have held contrary information was insufficient without specifically identifying reports that contained that information). And conclusory allegations that a defendant's position in the company is itself evidence of access to contrary information will not do because the Court "cannot impute factual knowledge to individuals merely based on their professional position." *Syneos*, 75 F.4th at 242.

Fatally, Plaintiffs' allegations stop short of demonstrating that Lowe or Reynolds had access to specific, damaging reports that allegedly contradicted their public statements. *See KBC*, 19 F.4th at 609. FE1 alleges that he "had access to information about MVF's utilization because [he] was responsible for reporting the 'actual results' of MVF in the form of a monthly 'financial review' or 'P&L' review." Amended Complaint ¶ 53. He further states that he personally saw information on the reports indicating that Wolfspeed was "not hitting" its MVF utilization targets, a fact he communicated to Kevin Speirits, Wolfspeed's Senior Vice President for Finance. *Id.* ¶ 54. But that is where FE1's specific allegations end because FE1 states without any support that he "would have assumed" that "Lowe and Reynolds received the P&L reviews," *id.*, and "[i]t was [his] understanding that the final rollup documents would go to Lowe and Reynolds," *id.* ¶¶ 69, 85.

26

FE2 relies on similar conclusory statements to connect the reports to Lowe and Reynolds. He alleges that "he and his colleagues sent weekly reports to the Vice-President level of the Company with data on revenue, backlog, price, cost, facility performance and demand planning[.]" *Id.* ¶ 76. But, again, he makes the conclusory statement that "there's no way" that Lowe and Reynolds "couldn't have known" about the information contained in the reports. *Id.* ¶ 75. At best, he supports that assertion by merely explaining that "the reports were definitely sent to the chain of employees *underneath* Lowe and Reynolds, including those at the vice president and director level." *Id.* ¶ 76 (quotation modified and emphasis added). At worst, FE2 falls back on vague allegations that problems were rumored throughout the Company, *see, e.g., id.* ¶ 210, which is not probative of scienter as a matter of law, *see SolarEdge,* 2025 WL 1031154, at*8-9.

These allegations do not sufficiently support scienter. They are "vague and conclusory, and lack particularized facts demonstrating Defendants intentionally or recklessly misled investors." *KBC,* 19 F.4th at 609. Plaintiffs' allegations here are in-line with the allegations held to be insufficient in *Advance Auto Parts. See* 167 F.4th at 649. Here, as there, FE1 and FE2 merely allege that they prepared or reviewed reports revealing MVF's problems and "discussed the issue with their direct supervisor and a Senior Vice President of Finance, neither of whom is a defendant here." *Id.* And here, as there, the FEs' "mere belief that the rest of the senior management team knew about the

27

issue is too speculative to support scienter." *Id.*; *see also Yates*, 744 F.3d at 887 (plaintiffs may not rely on conclusory allegations concerning a defendant's state of mind); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009) ("conclusory assertions about the defendants' scienter" such as allegations that a defendant "had to have known what was going on" were insufficient); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' such knowledge is insufficient." (quoting *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011)); *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1350 (M.D. Fla. 2007) ("[I]t is not enough to make conclusory allegations that Defendants had access to the 'true facts' in order to demonstrate scienter ….").

Appearing to recognize their pleading deficiency, Plaintiffs argue that "[c]ourts do not require direct contact" between former employees and the defendants "where witnesses describe information flowing to senior management." Dkt. 112 at 28 (collecting cases). But while it may not be the case that direct contact is *required*, the Fourth Circuit has stated that a "general lack of direct contact" between an anonymous former employee and the individual defendants "*weakens* the inference of scienter." *KBC*, 19 F.4th at 609 (emphasis added); *see also Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 162 (1st Cir. 2019). And, in any event, Plaintiffs do not describe how the information they contend contradicted Defendants' public statements flowed to senior management like Lowe or

28

Reynolds, only the FEs' superiors. The remaining allegations are, as explained above, vague and conclusory. *See Zucco*, 552 F.3d at 997-98.

Plaintiffs' own cited authority belies the weakness of their position. For instance, although Plaintiffs contend that *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747 (9th Cir. 2023), indicates that their allegations of reports sent to employees underneath Lowe and Reynolds are sufficient, *see* Dkt. 112 at 28 n.19, such allegations were only sufficient in *Glazer* because the former employee provided detailed allegations as to how the information in the reports reached one of the individual defendants specifically through weekly meetings with the former employee's boss, 63 F.4th at 773. The Amended Complaint only alleges without specificity that the reports here were shared with upper management *generally*, not Lowe or Reynolds *specifically*. *See* Amended Complaint ¶ 84. Nor does the Amended Complaint provide the mechanism for how the reports would have progressed from the FEs' superiors to Lowe or Reynolds (much less the specific contents of the allegedly damaging reports). *See Long Miao*, 442 F. Supp. 3d at 792 (no inference of scienter where plaintiffs failed to specifically plead contrary information contained in reports).

Even in the cases that appeared to credit general allegations that "upper management" reviewed reports, those allegations were supported by indicia of reliability supporting the former employees' beliefs that the individual defendants specifically saw the damaging information allegedly contained in the reports. *See, e.g., Ollila v. Babcock &*

29

*Wilson Enters., Inc.*, No. 3:17-cv-109, 2018 WL 792069, at *2-3 (W.D.N.C. Feb. 8, 2018) (allegations supported by the specificity of the allegations concerning the reports' contents and specific actions taken by management that suggested knowledge of the reports' contents); *In re James River Grp. Holdings, Ltd. Sec. Litig.*, No. 3:21-cv-444, 2023 WL 5538218, at *11 (E.D. Va. Aug. 28, 2023) (allegations supported by the executives' own public statements referencing information in the reports and allegations that people that worked closely with those executives testified in related litigation to the executives' knowledge of information contained in the reports). But unlike *Ollila* and *James River*, Plaintiffs here direct the Court to nothing lending credibility to the FEs' conclusory allegations that Lowe and Reynolds saw or had access to the reports, and they make no allegations as to what specific information in those reports contradicted the Defendants' public statements. Further, *Ollila* and *James River* predate *Advance Auto Parts*, where the Fourth Circuit specifically rejected a former employee's similar allegations that *some* members of upper management reviewed damaging reports because "the employee's mere belief that the rest of the senior management team knew about the issue is too speculative to support scienter." 167 F.4th at 649.

Plaintiffs' allegations "fall short of an inference that" Lowe or Reynolds "were aware of any specific deficiency" with MVF, at least from the reports alone. *See In re Marriot Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 145 (D. Md. 2021) (allegations that former employees believed the individual defendants to be aware of

data-security issues because those defendants attended senior leadership meetings where data-security problems were raised did not particularize the former employees' specific concerns to the individual defendants). With no allegations explaining why the FEs possessed personal knowledge to support their matter-of-fact assertions that the reports progressed up the chain from their bosses to Lowe or Reynolds, the Court "declines to credit this inference in support of scienter." *See Pipefitters Loc. No. 636 Defined Benefits Plan v. Tekelec*, No. 5:11-cv-4, 2013 WL 1192004, at *12 (E.D.N.C. Mar. 22, 2013) (former employee's allegation that a defendant served on a team that discussed information contradicting his public statements were conclusory where that employee "did not serve" on the team and made "no allegations about what" team-members discussed); *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 43-44 (1st Cir. 2017) (affirming dismissal where FEs' statements failed "to give rise to a strong inference of scienter because they lack specific descriptions of the precise means through which the defendants' alleged fraud occurred" (quotation modified and internal quotations omitted)).

C. **Lowe's public statements concerning MVF do not support an inference of scienter.**

The Amended Complaint does not support a strong inference of scienter as to Lowe based on his public statements revealing familiarity with MVF and its ramp-up.[12]

---

[12] Obviously, because these public statements came from Lowe and speak only to his personal knowledge, they have no bearing on Reynolds or his scienter. *See Matrix*, 576 F.3d at 190; *Yates*, 744 F.3d at 885. They do, however, speak to Wolfspeed's corporate scienter. *Hunter*, 477 F.3d at 184.

Plaintiffs point to allegations in the amended complaint regarding Lowe's "specific and repeated statements about MVF" during the Class Period as evidence of scienter. *See* Hr'g Tr. 80:17-24; *see also* Dkt. 112 at 30-31. Plaintiffs point to three kinds of statements issued by Lowe during the Class Period: (1) statements highlighting his "focus" on MVF ramp; (2) statements indicating that Lowe had recently visited MVF; and (3) statements issued by Lowe providing specific, present MVF ramp percentages. *See* Amended Complaint ¶¶ 113, 146, 161, 200-201, 216-17. None of these statements, however, reveal personal or intimate knowledge about MVF ramp, utilization rates, or revenues contrary to the information Lowe publicly disclosed to the marketplace.

The Amended Complaint focuses on the following statements, among others. It alleges that in October 2023, Lowe explained that he visited MVF the week prior and planned to return twice more in November 2023 "to continue the focus of Mohawk Valley Ramp to 20% utilization." *Id.* ¶ 200. He further stated, "By the end of this quarter, we will be producing enough material to support 15% utilization at Mohawk Valley[.]" *Id.* ¶ 113. In January 2024, Lowe emphasized that he "spent a lot of time at Mohawk Valley this past quarter and witnessed the dedication of our team firsthand." *Id.* Lowe also stated during the May 2024 earnings call that MVF was "on track" to achieve 20% utilization in June 2024 and that it was "already at more than 16% utilization." *Id.* ¶ 215. Finally, in September 2024, Lowe acknowledged that the Company had been working on improving operations over "the last 6 quarters," and stated, "I've been in Mohawk

32

Valley[, and] I've been in our materials factories pretty consistently during this time." Dkt. 101-15 at 5.[13]

While the Court agrees that the public statements above indicate Lowe's personal involvement with the MVF project, that fact alone fails to plead a strong inference scienter. The Fourth Circuit has cautioned against inferring knowledge about specific information from "the mere fact that Defendants learned general information about" a company's business. *See Syneos*, 75 F.4th at 242. Indeed, allegations that Defendants "should have known about certain business facts given their diligence" does nothing more than indicate Defendants "negligently performed due diligence." *Id.* (emphasis removed). "[W]ithout detailed allegations showing that [an individual defendant] had … *actual knowledge* of the red flags, these allegations 'are not sufficient to raise a strong inference of scienter'" because "[i]f they were, every corporate executive who participates in the day-to-day management of his company would be exposed to liability for securities fraud." *Giraudon v. Innovative Indus. Props., Inc.*, No. GLR-25-182, 2026 WL 1487502, at *19 (D. Md. May 27, 2026) (quoting *Criimi Mae*, 94 F. Supp. 2d at 661).

---

[13] The Court notes that Plaintiffs appear to have misquoted Lowe's earlier statement in the Amended Complaint by inserting the words "at MVF" after the word "operations" into Lowe's following statement: "Obviously, one of the things we've been working on over the last 6 quarters is getting the operations in better shape." *See* Dkt. 101-15 at 5; *see also* Amended Complaint ¶ 200. But when read in the earnings call's context, Lowe is referring to Wolfspeed's company-wide operations, not MVF specifically.

Plaintiffs' allegations concerning Lowe's "focus" on MVF fail to allege that he knew of information contrary to his public statements concerning MVF ramp, utilization, or revenues. The Complaint alleges that in conjunction with his public statements indicating his personal involvement with the MVF project, Lowe said several times that he was "laser-focused" on MVF ramp or that MVF's operations were a "key focus" for him. *See* Amended Complaint ¶¶ 121, 145, 200. But beyond vaguely asserting his "focus" on MVF utilization and operations, Lowe's public statements do not indicate *how* he would have garnered "actual exposure" to the problems that Plaintiffs highlight in their Amended Complaint beyond the mere fact of visiting MVF. *See Yates*, 744 F.3d at 890 ("[W]ithout additional detailed allegations" beyond senior executives' focus on core corporate operations that could "establish[] the defendants' actual exposure to the accounting problem, the complaint falls short of of [sic] the PSLRA's particularity requirements."); *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 508 & n.13 (E.D. Va. 2018) (concluding that allegations generally describing an individual defendant's "role in overseeing [the challenged] accounting practices" did not allege sufficient additional facts supporting defendant's knowledge of specific financial information allegedly withheld from investors). Lowe's "focus" on MVF ramp and operations is therefore not enough, as that fact amounts to little more than an assertion that Lowe *should have* known about problems with MVF given his "focus" on the project, which—since it amounts to negligence at best—cannot support an inference of scienter. *See Syneos*, 75 F.4th at 242.

34

Nor do Lowe's statements regarding his visits to MVF support scienter. Although the FEs contend that that MVF was struggling to hit the targeted 20% utilization during the Class Period, *see, e.g.*, Amended Complaint ¶¶ 60, 163-64, they do not explain how Lowe would have encountered that information during one of his site visits to MVF given the relevant timeline of events and the FEs' roles at Wolfspeed, *see Barpar v. Elanco Animal Health Inc. Sec.*, No. 24-2912, 2026 WL 836731, at *32 (D. Md. Mar. 26, 2026) (declining to credit FE testimony where FE had "no direct knowledge of what Defendants in this matter knew" (internal quotations omitted)). Neither FE worked at MVF, so neither FE possesses personal knowledge about what information Lowe may (or may not) have learned during his visits to the factory. *See Hunter*, 477 F.3d at 179; *Novak*, 216 F.3d at 314; *see also SolarEdge*, 2025 WL 1031154, at *9 (employee who worked for company in the United States could not speak to company's business in Europe without any basis for why he would be familiar with company's business abroad). And Plaintiffs do nothing to connect the information the FEs allegedly learned from Wolfspeed's internal reports to information that Lowe may (or may not) have learned from site visits to MVF.

The allegations in the cases that Plaintiffs cite went far beyond bare allegations of "focus" and visits. One case concerned an individual defendants' public statements touting his personal involvement in preparing the financial statements the plaintiffs adequately alleged were false. *See In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015). And the other two cases concerned allegations that defendants

35

specifically encountered the information they failed to disclose to investors through their due diligence and site visits.  *See Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 607 (E.D. Va. 2015); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 15-cv-2393, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016).  The more specific allegations in *Genmore*, *Kiken*, and *3D Systems* demonstrating how the defendants actually encountered red flags contrast with the bare allegations that Lowe should have or must have learned about red flags through his visits to and focus on MVF.  Plaintiffs' allegations here mirror the deficient allegations in *Syneos*, which merely asserted that because the defendants held due diligence meetings with the target of their merger, they must have discovered specific problems with the target company.  *See* 75 F.4th at 242.

Further, the mere fact that Lowe spoke knowledgeably about MVF's ramp by disclosing specific ramp percentages at various points during the Class Period does not suggest he knew of or recklessly disregarded information contrary to the numbers he disclosed.  *See In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1282 (S.D. Fla. 2017) (the fact a defendant "spoke intelligently" about something is not "strong circumstantial evidence" he received specific, contrary information that he failed to disclose); *Maguire*, 876 F.3d at 547 ("[A]n inference that [a defendant] may have known his statement was false does not alone satisfy the scienter requirement.").  The Amended Complaint offers nothing beyond the FEs' allegations to suggest that Lowe had any reason to doubt the truthfulness of the numbers he disclosed to investors.  But again, while the FEs contend

36

that MVF never reached 20% utilization—much less 16% utilization, as Lowe disclosed on May 1, 2024—there is no basis for imputing knowledge of (or reckless disregard for) that specific fact onto Lowe.  Neither FE worked at MVF, so neither can speak intelligently as to how Lowe should have learned through his site visits and alleged "focus" on the factory that the numbers he publicly disclosed were false.  And, as discussed above, Plaintiffs do not connect the FEs' allegations regarding reporting to Lowe.  *See Barpar*, 2026 WL 836731, at *32 (giving little weight to FE testimony where FE had "no direct knowledge of what Defendants in this matter knew"); *Hunter*, 477 F.3d at 179 (rejecting witnesses' testimony not based on personal knowledge).

Additionally, Lowe's specific public statements in August and September 2024 merely parrot previously-disclosed public information.  During an August 2024 earnings call and a September 2024 investor conference, Lowe touted that MVF had reached 20% utilization in July 2024 as planned.  *See* Amended Complaint ¶¶ 216-17.  While that statement is specific, it reiterates points already disclosed by Wolfspeed in June 2024 when it issued the press release announcing MVF's 20% utilization, *see* Dkt. 101-11, which the Amended Complaint acknowledges, *see* Amended Complaint ¶ 161.  Because Lowe spoke about already-disclosed metrics, his statements do not suggest that he must have educated himself beyond simply maintaining awareness of the Company's prior public disclosures.

Plaintiffs' various theories as to why Lowe's own public statements indicate that he knew of or recklessly disregarded information contradictory to Defendants' public disclosures are rejected. At best, the allegations collectively assert that Lowe maintained a general awareness of MVF, including the progress of its ramp-up, through regular visits to the site. While it is possible that Lowe may have come across information contradicting Defendants' public position regarding MVF during one of his visits, the more compelling inference is that Lowe knew no more than what the Company disclosed, especially given the generality and timing of his public statements and the Amended Complaint's inability to connect the FEs' alleged knowledge of contrary facts to Lowe.

**D.      MVF's centrality to Wolfspeed's business is probative of scienter, but insufficient to plead scienter on its own.**

The mere fact that MVF is central to Wolfspeed's business cannot plead scienter on its own. While allegations of "core operations" are "relevant" to the Court's "holistic analysis of scienter," *Yates*, 744 F.3d at 890, they are insufficient to plead scienter on their own because they amount to "bare allegations" that officers have "knowledge of key facts" because of their "corporate position," *KBC*, 19 F.4th at 612 (internal quotations omitted); *Syneos*, 75 F.4th at 242 (courts may not "impute factual knowledge to individuals merely based on their position").

Nonetheless, MVF as a "core operation" is probative of scienter because it cannot be disputed that MVF was critical to Wolfspeed's financial success during the Class Period. *See Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 527 (D. Md. 2022). In cases

38

where, as here, the allegedly withheld information concerned subject matter "critical to the long term viability" of the company and events "affecting a significant source of income," courts have more readily drawn the inference of scienter based on core operations as part of their holistic analysis of a complaint's allegations. *See In re HI-Crush Partners L.P. Sec. Litig.*, No. 12-cv-8557, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)); *see also, e.g., Davis v. Keppler*, 814 F. Supp. 3d 563, 590 (D. Md. 2025) (production plant's significance to defendant corporation's business supported inference that defendants knew of facts undermining their public disclosures concerning that plant). Thus, while insufficient on its own, MVF's centrality to Wolfspeed's business at least weighs in favor of Defendants' scienter.

### E. The "suspicious" timing of MVF's operational turn-around is not probative of scienter.

According to Plaintiffs, Wolfspeed disclosed delays ramping MVF prior to the Class Period only to then abruptly reverse course at the beginning of the Class Period to tout smooth operations at the facility, supporting a strong inference of scienter. Amended Complaint ¶ 231; *see also* Hr'g Tr. 65:19-66:11. But this is a logical fallacy. The timing of MVF's turn-around is only "suspicious" because Plaintiffs make it so, as they are the masters of their Amended Complaint and therefore control much about their lawsuit, *see Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025), including when the Class Period begins and ends. Because it is *Plaintiffs* that control when the Class Period begins—and therefore when Defendants' public statements concerning MVF ramp and

39

utilization allegedly became false or misleading—their allegations are simply self-manufactured temporal proximity. Such allegations are little more than accusations of fraud informed by hindsight. *Cf. KBC*, 19 F.4th at 613 (allegations of close temporal proximity between misleading statements and corrective disclosures "amounts to little more than pleading fraud by hindsight" (quoting *Triangle Cap.*, 988 F.3d at 753)); *see also Pension Tr. Fund for Operating Eng'rs v. Clarivate Plc*, 826 F. Supp. 3d 296, 338 (E.D.N.Y. 2026) ("[T]emporal proximity is too ephemeral a connection to raise a strong inference of scienter.") (internal quotations omitted).

Ironically, the Amended Complaint does not even allege a "sudden and inexplicable" operational turn-around at MVF anyways. *See* Amended Complaint ¶¶ 231. The so-called "suspicious" ramp-up turnaround at the factory occurred over the course of *fourteen months*, between April 2023, when the Company announced that Wolfspeed intended to reach 20% utilization at MVF in June 2024, and June 2024, when it announced it had reached that utilization target. *See id.* ¶¶ 42, 161. The Amended Complaint is also rife with cautionary language from Reynolds during the August 2023 earnings call that supposedly kick-started the "suspicious" turn-around (and the Class Period), where he repeatedly warned investors that it was still a long road before MVF reached 20% utilization.[14] Elsewhere in that same earnings call, Lowe and Reynolds

---

[14] *See, e.g., id.* ¶ 106 ("[I]t is important to note that it will be the second half of the calendar year 2024 before we see $100 million of quarterly revenue from the fact that the 20%

repeatedly acknowledged delays and emphasized that they had not changed their outlook on the timing of MVF ramp despite their rosier outlook on the future.[15]

    **F.**    **Lowe's termination after the Class Period does not support scienter.**

Lowe's termination after the Class Period is not probative of scienter because Plaintiffs do not plead sufficient facts to equalize the competing inference that Lowe was fired because he was CEO when Wolfspeed announced exceedingly poor financial results. A defendant's termination close-in-time to an alleged corrective disclosure is only probative of scienter if plaintiffs "plead facts refuting the reasonable assumption that the [termination] occurred as a result of the [disclosure's] issuance itself[.]" *Yates*, 774 F.3d at 889. Even then, a close-in-time termination is "at best, weak evidence of scienter." *Advance Auto Parts*, 167 F.4th at 650. So far, Plaintiffs have failed to allege any factor supporting scienter beyond the mere fact that MVF was core to Wolfspeed's

---

utilization would represent."); *id.* ¶ 109 ("So as we get the 20% towards the end of the year, you wouldn't expect to see the revenue translation of that, as we get a 20% utilization, say, by the June quarter, we wouldn't expect a revenue translation of EPI, the equivalent of $100 million to be sometime after that sometime in the second half of calendar '24.").

[15] *See, e.g.*, Dkt. 101-1 at 9 (Lowe acknowledging that "delay of the ramp of Mohawk Valley" "creates an impact" on customer expectations, but that the Company was working to "realign[] those expectations to be in concert with how we expect to ramp the Mohawk Valley"); *id.* at 10 (Reynolds stating, "So no change to the outlook in terms of the timing of bringing [MVF] up online up to 20%. So we anticipate getting to 20% utilization by the end of this fiscal year."); *id.* at 13 (Lowe touting MVF's growth as "in excellent shape right now," but acknowledging that "[t]here are some pinch points" and "as we ramp [MVF], there's going to be different pinch points").

41

business.  Absent aggravating suspicious circumstances indicating that the termination was motivated by earlier fraud, the Court is left with nothing to contradict the competing inference that Lowe was fired because he helmed the ship when Wolfspeed announced disappointing results in November 2024.  *See Knurr*, 294 F. Supp. 3d at 509.

### G. Holistically, Plaintiffs' allegations do not plead a strong inference of scienter as to misstatements about MVF ramp, utilization, or revenues.

Even viewed together, Plaintiffs' allegations regarding MVF do not support a strong inference of scienter.  Because the Court must view Plaintiffs' allegations of scienter holistically, it may be the case that "[a]llegations of scienter that would not independently create a strong inference of scienter might complement each other to create an inference of sufficient strength to satisfy the PSLRA."  *Matrix*, 576 F.3d at 187-88.  But if there is only "some reason to believe Defendants acted with the requisite intent" when Plaintiffs' allegations are viewed collectively, "there is not enough to create a *strong* inference of scienter."  *KBC*, 19 F.4th at 613.

Plaintiffs' allegations are not complementary enough to build a strong inference of scienter.  Read together, and stripped of conclusory allegations, Plaintiffs' allege the following: (1) Wolfspeed could reduce liquidity covenants in secured notes held by creditors by reaching 30% and 50% utilization at MVF; (2) some number of low-level employees at Wolfspeed began to worry that MVF was not reaching the metrics touted by the Company publicly, which they learned from reports passed to employees below Lowe and Reynolds; (3) Lowe maintained a general awareness of MVF's ramp and visited

42

the site throughout the Class Period; (4) MVF was central to Wolfspeed's business during the Class Period; (5) Wolfspeed maintained a rosier view of MVF's ramp during the Class Period than prior to the Class Period; and (6) Lowe was fired not long after the Company announced its poor financial results in November 2024.

Even taken together, these allegations are not enough. The liquidity covenants are not probative of motive to defraud, especially given that Plaintiffs make no allegations that Defendants tried to reach the utilization rates necessary to reduce them during the Class Period. The absence of motive weighs strongly *against* Plaintiffs in the scienter analysis. *See Syneos*, 75 F.4th at 242. Further, Plaintiffs do not plead how Lowe or Reynolds could have encountered specific information contrary to their public disclosures either through internal reporting or visits to MVF. *See id.* (cautioning against inferring knowledge about specific information from allegations that defendants generally had access to information about the subject of their disclosures). Though the centrality of MVF to Wolfspeed's business weighs slightly in favor of scienter, *see Yates*, 744 F.3d at 890, it is not enough on its own, *KBC*, 19 F.4th at 612, especially when the inference is outweighed by the lack of motive to defraud, *see Syneos*, 75 F.4th at 242. Plaintiffs' remaining allegations amount to little more than allegations of fraud by hindsight—*e.g.*, bare allegations that Lowe's termination, Wolfspeed's bankruptcy, and temporal proximity between certain positive and negative disclosures indicate that Lowe and Reynolds knew of or recklessly disregarded damaging information regarding MVF

43

that they failed to disclose to investors during the Class Period. *See Bos. Sci.*, 523 F.3d at 90 (defining fraud by hindsight).

At best, the Amended Complaint accuses Lowe of negligently failing to uncover problems with MVF given his periodic visits and "focus" on the project, which does not meet Plaintiffs' burden. *See Advance Auto Parts*, 167 F.4th at 646. And Plaintiffs' allegations as to Reynolds are especially poor, as they provide *no basis* for connecting him to specific, undisclosed information regarding MVF's ramp, utilization rates, or revenues, either through reporting or visits. *See Matrix*, 576 F.3d at 190 (plaintiff must plead *each* individual defendant *personally* possessed scienter). These deficiencies are highlighted by the largely conclusory and non-specific allegations of the two FEs, both of whom lack the indicia of reliability necessary for the Court to credit their allegations probative of scienter. *See Cree*, 333 F. Supp. 2d at 472 (outlining factors to consider when determining the reliability of confidential witnesses' allegations).

Additionally, "[t]he breadth of Defendants' risk disclosures to investors further strengthens the competing inference of innocence." *See Triangle Cap.*, 988 F.3d at 755. Defendants' 10-K filings and earnings calls were accompanied by cautionary language repeatedly warning investors about various risks with MVF including, "ramping production" at the facility, *see, e.g.*, Dkt. 101-7 at 3; Dkt. 101-8 at 3; Dkt. 101-9 at 3, and Wolfspeed's "ability to meet targeted utilization rates," *see, e.g.*, Dkt. 101-8 at 3; Dkt. 101-9 at 3; Dkt. 101-10 at 3. And Lowe and Reynolds were frank during investor calls about

44

the speed of MVF ramp and possible "pinch points." *See, e.g.*, Dkt. 101-1 at 13. "A disclosure that meaningfully alerts investors to [a] risk … may suggest that the individuals responsible for the disclosure did not knowingly (or perhaps not even recklessly) misstate" facts to investors. *Matrix*, 576 F.3d at 187. Considering Plaintiffs' weak allegations of scienter, Defendants' cautionary disclosures further undercut an inference of scienter in Plaintiffs' favor.

Given the timeline of events and the allegations in Plaintiffs' Amended Complaint, the more reasonable inference is that Wolfspeed hoped to overcome prior setbacks to get the MVF project back on track, even though their optimism did not translate to actual results. They espoused public confidence about MVF while also reminding investors about possible hurdles, and, most importantly, they updated their public position as they learned that MVF would not achieve the goals touted by the Company. And Lowe's termination and Wolfspeed's bankruptcy are more consistent with the Company's poor November 2024 financial disclosures than with fraud. Accordingly, Plaintiffs fail to adequately plead any Defendant possessed scienter as to any of the alleged misstatements concerning MVF ramp, utilization, and revenues. Those misstatements are properly dismissed.

## II. Plaintiffs Do Not Plead a Strong Inference of Scienter as to the Statements About Demand for Wolfspeed's Products.

Plaintiffs plead even less factual content regarding Defendants' supposed awareness of declining demand for Wolfspeed's products, so these misstatements will be

dismissed, as well. Although there is some overlap with their allegations concerning misstatements regarding MVF, the Court summarizes Plaintiffs' allegations of scienter regarding declining demand as follows:

(1) Lowe and Reynolds had access to internal documents revealing declining demand for Wolfspeed's products, and various employees sounded the alarm regarding problems with demand, *id.* ¶¶ 78-86, 202-13;

(2) Employees at Wolfspeed were pressured to make new sales and manipulate the Company's quarterly earnings results to hide the Company's declining demand, *id.* ¶¶ 62-77, 87-104;

(3) Lowe and Reynolds' public statements reveal their awareness of declining demand, *id.* ¶¶ 232-45; and

(4) Wolfspeed terminated Lowe soon after the alleged fraud was revealed to the marketplace, *id.* ¶¶ 246-51.

All of Plaintiffs' allegations of scienter as to declining demand fail individually and collectively. Much like their allegations concerning MVF, Plaintiffs fail to adequately plead that Lowe or Reynolds knew of or recklessly disregarded information contrary to the Company's public statements regarding demand. Additionally, pressuring employees to make sales or augment financial results is not de facto probative of scienter. Nor does the Court find that Lowe or Reynolds' own public statements indicate an awareness of demand problems. Finally, Lowe's departure, as explained above, is not suspicious based on the facts alleged in the Amended Complaint.

46

As with the allegations regarding MVF, the Court begins by analyzing Plaintiffs' allegations about demand individually before addressing them holistically. It concludes that they fail to state a claim.

### A. Plaintiffs do not adequately plead Defendants had access to information contradicting their public statements.

Plaintiffs' access-to-information allegations fair no better as to declining demand than they did as to MVF ramp, utilization, or revenues. As before, FE1 and FE2 resort to conclusory assertions to connect alarm bells concerning declining demand to Lowe and Reynolds. Those conclusory allegations do not adequately plead that Defendants had access to information contradicting their public statements concerning demand. *See Zucco*, 552 F.3d at 998.

FE1's allegations are conclusory and largely rely on unspecified rumors. FE1 heard about declining demand around February 2024 from "direct conversations [he] had with the Company's Sales financial analysists and controllers," who averred that the Company had set an "unrealistic number" for demand. Amended Complaint ¶¶ 65-67. He adds that by March 2024 there was "a lot of concern" throughout the Company that it needed to reduce costs to make up for a growing backlog of unsold product. *Id.* ¶ 68. Further, FE1 stated that "he assumed there were other conversations going on with Lowe and Reynolds" regarding budgeting at the Company to make up for declining demand, adding that "there was a lot of panicking around demand" in general when he left Wolfspeed. *Id.* ¶ 85.

47

FE2's allegations fair no better because they largely rely on conclusory assertions and unverifiable conjecture. Plaintiffs allege that FE2 became aware of declining demand soon after he joined Wolfspeed in February 2024 by reviewing the Company's P&L reports. *Id.* ¶¶ 63-64. FE2 further alleges that employees that worked below Reynolds were "constantly fighting within the Company to say, 'Look something has to change,'" so "there's no way" that "senior leaders" like Lowe and Reynolds "couldn't have known" about falling demand. *Id.* ¶¶ 74-75 (quotation modified). FE2 further alleges that damaging reports were shared with employees below Lowe and Reynolds, and he adds that declining demand was "definitely a problem that was talked about" generally throughout the Company. *Id.* ¶¶ 75-76.

As before, Plaintiffs' allegations are woefully deficient. Chatter among low-level employees about supposed problems is not probative of scienter when there is no allegation "that management was ever informed of" employee concerns. *See Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 316 (4th Cir. 2004); *Advance Auto Parts*, 167 F.4th at 649; *KBC*, 19 F.4th at 609. While FE2 alleges that certain employees below Reynolds and Lowe were "constantly fighting within the Company" to raise alarms about declining demand, Plaintiffs fail to specifically allege *how* those employees "passed their concerns on to" Lowe or Reynolds or that the pair were "otherwise aware of the problems alleged." *KBC*, 19 F.4th at 609. And the FEs' allegations of internal reports revealing declining demand are vague and conclusory, failing to allege the specific contents of the reports or the

48

precise means by which they progressed up the corporate chain to Lowe or Reynolds; accordingly, they are too non-specific to support scienter. *See Advance Auto Parts*, 167 F.4th at 649; *see also Sanofi*, 155 F. Supp. 3d at 406-07. And the FEs' fallback allegations that demand problems were "known or common knowledge within the company" is a classic example of FE testimony that is "too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity." *See In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010); *see also Hunter*, 477 F.3d at 181 (declining to credit "conclusory and hardly probative statements by four confidential sources" to the effect that the problem was "well-known" within the company); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004) ("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of [the PSLRA]."). Plaintiffs therefore fail to allege that Defendants had access to information undermining their public disclosures concerning demand for Wolfspeed's products.

### B. An internal "pressure campaign" at Wolfspeed to make sales and meet financial targets is not probative of scienter.

Plaintiffs' allegations of an internal pressure campaign at Wolfspeed to meet sales targets and financial projections do not plead scienter, either. Plaintiffs contend that "the pressure Defendants placed on Wolfspeed employees to meet financial targets" supports an inference of scienter, *see* Dkt. 112 at 33, pointing to allegations in the Amended

Complaint recounting testimony from FE1 to the effect that employees at Wolfspeed faced top-down pressure to make sales or otherwise augment financial statements to hide growing inventory backlogs and declining demand, *see* Amended Complaint ¶¶ 65-69, 87-104.

Plaintiffs' allegations of sales pressure do not support scienter. "Pushing representatives to sell does not, on its own and without more, suggest that management was encouraging or was aware of widespread fraud." *SolarEdge*, 2025 WL 1031154, at *10 (internal quotations omitted and quotation modified). And low-level employees' belief that sales targets were "unrealistic," *see* Amended Complaint ¶ 65, does not bridge the gap to connect aggressive sales targets to Defendants' knowledge of or severe recklessness as to fraud, *see SolarEdge*, 2025 WL 1031154, at *10; *see also San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 321 (S.D.N.Y. 2024) ("[A]gressive sales targets do not necessarily suggest wrongdoing.").

Nor do Plaintiffs' allegations of financial misreporting carry the day because nothing in the Amended Complaint connects the misreporting to Lowe or Reynolds. FE1 alleges that "Wolfspeed essentially used capitalized variances to push off acknowledging increased costs by saying that it would match them with sales in the future." *See* Amended Complaint ¶ 101. But curiously, the Amended Complaint provides no allegation of *who* was responsible for instructing FE1 to "look for potential adjustments to be made in 'inventory reserves' and 'capitalized variances'" besides FE1's direct

50

superior, Speirits. *See id.* ¶¶ 89-90. As the Fourth Circuit acknowledged in *Ottmann*, however, for allegations of accounting irregularities to support a strong inference of scienter, Plaintiffs must demonstrate that the irregularities were, at minimum, "so obvious that [Defendants] must have been aware of [them]." *See* 353 F.3d at 351; *see also Novak*, 216 F.3d at 309 (without facts showing "corresponding fraudulent intent," allegations of "accounting irregularities, standing alone, are insufficient to state a securities fraud claim" (internal quotations omitted)). Here, Plaintiffs "allege no facts to show that Defendants knew or could have known of the [misreporting], or that their regular procedures should have alerted them to the [misreporting] sooner than they actually did." *See In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999).

Instead, Plaintiffs merely plead a vague "pressure campaign" flowing from upper management to make sales, offload excess product, and "fix" Wolfspeed's financial reporting to align with its public disclosures, *see* Amended Complaint ¶¶ 65-69, 87-101, which is not enough. Relying on the Ninth Circuit's opinion in *Glazer*, Plaintiffs disagree, contending that FE1's allegations of a pressure campaign are sufficient on their own to support Defendants' scienter as to the demand misstatements. Dkt. 113 at 33; *see also Glazer*, 63 F.4th at 772 ("Plaintiffs' allegations of a company-wide pressure campaign, on their own, are sufficient to raise a strong inference of scienter.").

But *Glazer* is distinguishable from this case. For one, the complaint in *Glazer* specifically alleged that "the pressure campaign came directly from" the company's CEO,

one of the individual defendants. *Id.* at 772. And that allegation was supported by a confidential witness who substantiated that employees generally recognized the existence of a "pressure campaign" because he identified "a specific group of employees … who were subjected to the alleged pressure" and "a specific high-level employee … who found the pressure campaign so burdensome that he left the company." *Id.* at 772-73. Further, the Ninth Circuit credited the allegations of a "pressure campaign" in part because the plaintiffs specifically alleged that the CEO that pushed the pressure campaign "had access to information about the sales pipeline and the status of deals through internal reports." *Id.* at 773. Here, Plaintiffs do not connect the alleged "pressure campaign" to any individual defendant, do not make specific allegations crediting the campaign's existence beyond FE1's subjective belief that "there was a lot of pressure in the wrong way," Amended Complaint ¶ 104, and do not explain how internal reporting structures indicate that Lowe or Reynolds could have even possessed the information necessary to spearhead the pressure campaign that Plaintiffs allege. Plaintiffs' allegations of sales pressure and financial misreporting fail to adequately plead scienter as to any Defendant.

> **C.    Lowe and Reynolds' public statements do not evince knowledge of or recklessness as to declining demand.**

Once again, Plaintiffs allege that Defendants' own public statements concerning demand for Wolfspeed's products reveal their hidden awareness of problems, but their public statements do no such thing. Specifically, the Amended Complaint highlights

statements from Lowe and Reynolds drawing investors' attention to strong demand for the Company's products at a time when Wolfspeed's competitors reported headwinds. *See id.* ¶¶ 232-45. Again, the allegation that Defendants' own public statements reveal knowledge of contrary information amounts to the mere allegation that Defendants *should have* known that their public statements were false, *see KLX*, 232 F. Supp. 3d at 1282, which does not establish scienter, *see Advance Auto Parts*, 167 F.4th at 648 ("[N]eglience isn't enough to sustain a § 10(b) claim.").

In any event, Defendants' optimism about demand during a turbulent time is not probative of scienter. The Amended Complaint "may not simply contrast a defendant's past optimism with less favorable actual results in support of a claim for securities fraud." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008) (internal quotations omitted). Plaintiffs only allege that "Defendants' repeated assertions that Wolfspeed, and Wolfspeed alone, was seeing an increase in demand … while the EV market generally was experiencing declining demand supports a strong inference of scienter." Amended Complaint ¶ 245. But to infer fraudulent intent from the mere fact that Wolfspeed was optimistic when other companies faced headwinds would be tantamount to holding that because Defendants' optimism *later* turned out to be misguided, they must have *previously* known they were misleading investors. That is simply an allegation of fraud by hindsight. *See Triangle Cap.*, 988 F.3d at 753; *see also Maguire*, 876 F.3d at 548

53

("[L]iability for securities fraud should not be predicated solely on an overly optimistic view of a future which may, in fact, encounter harsh economic realities down the road.").

**D.      As explained above, Lowe's termination is not inherently suspicious.**

Again, Plaintiffs do not "plead facts refuting the reasonable assumption that [Lowe's termination] occurred as a result of the [corrective disclosure's] issuance itself." *Yates*, 774 F.3d at 889.  It is wholly unsurprising that Lowe, as CEO, would be asked to leave the Company in November 2024 given the Company's poor financial disclosures. Plaintiffs do not allege any aggravating factors tending to indicate Lowe's termination was for any reason other than those Wolfspeed publicly disclosed.  Even if they could, Lowe's firing is, "at best, weak evidence of scienter." *Advance Auto Parts*, 167 F.4th at 650.

**E.      Collectively, Plaintiffs' allegations do not establish Defendants' scienter as to their misstatements concerning demand for Wolfspeed's products.**

Viewed together, Plaintiffs' allegations look even weaker.  Plaintiffs allege that: (1) low-level employees expressed concerns about declining demand and growing inventory levels; (2) other low-level employees subjectively felt pressured to meet sales targets; (3) FE1 testified he was instructed by his superior to augment financial reports to hide declining demand; (4) other companies were not as optimistic about electric vehicle demand as Wolfspeed; and (5) Wolfspeed terminated Lowe after it announced its poor financial results in November 2024.  None of these allegations connect awareness of declining demand to Lowe or Reynolds.  Nor, frankly, do they suggest that Wolfspeed had any advanced knowledge of declining demand beyond chatter among low-level

54

employees.  These allegations are not enough to draw *any* inference of scienter as to Defendants' misstatements concerning demand, much less "enough to create a *strong* inference of scienter."  *Advance Auto Parts*, 167 F.4th at 651.

Therefore, like Plaintiffs' alleged misstatements regarding MVF ramp, utilization, and revenues, Plaintiffs' Amended Complaint is dismissed to the extent it challenges misstatements concerning demand for Wolfspeed's products.  Because Plaintiffs fail to adequately plead that any Defendant possessed scienter as to any misstatement (regardless of topic), Plaintiffs' Section 10(b) claim fails completely.

## III.    Plaintiffs' Section 20(a) Claim Fails.

Plaintiffs' claim for control-person vicarious liability under Section 20(a) fails as a matter of law.  Vicarious liability depends on "a primary violation of the securities laws," *Karp v. First Conn. Bancorp, Inc.*, 69 F.4th 223, 236 (4th Cir. 2023) (internal quotations omitted), and Plaintiffs fail to plead scienter, precluding them from stating a claim for violations of Section 10(b).  As such, all of Plaintiffs' claims, including their Section 20(a) claim, fail, and the Amended Complaint will be dismissed in its entirety.

## IV.    The Court Will Dismiss the Amended Complaint Without Prejudice.

It is not clear to the Court that Plaintiffs would benefit from a further opportunity to add to their allegations, but it will dismiss the Amended Complaint without prejudice. "In the Fourth Circuit, district courts are not required to give plaintiffs one without-prejudice ruling on the merits before dismissing with prejudice."  *United States ex rel.*

*Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 196 (4th Cir. 2022).  And the decision as to whether dismissal should be with or without prejudice is a decision that rests within the sound discretion of the district court.  *See id.; see also Weigel v. Maryland*, 950 F. Supp. 2d 811, 825 (D. Md. 2013).  Dismissal with prejudice is especially appropriate where "it is clear that amendment would be futile in light of the fundamental deficiencies in [the] plaintiffs' theory of liability."  *Cozzarelli*, 549 F.3d at 630.

Plaintiffs have had ample opportunity to bolster their allegations and present their best case to the Court.  *See MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 113 (4th Cir. 2025).  This lawsuit has been in active litigation for nearly two years, *see generally* Dkt. 1 (initial complaint filed on November 15, 2024), and Plaintiffs and their counsel have managed it since February 24, 2025, *see* Dkt. 34 (order appointing Plaintiffs lead plaintiffs and their counsel co-lead counsel).  The parties have submitted hundreds of pages of briefing and numerous supplemental exhibits in connection with Defendants' motion to dismiss.  The Court, per the parties' request, held a hearing on Defendants' motion to dismiss and provided both sides with an opportunity to present their arguments.  At the hearing, the Court probed Plaintiffs about the possibility that future amendment could correct potential deficiencies with the Amended Complaint.  *See* Hr'g Tr. 67:24-69:16.  Plaintiffs intimated that they could possibly contact further former employees to support their existing allegations.  *Id.* at 69:9-16.

56

Nonetheless, dismissal with prejudice is not warranted at this time. It is not clear to the Court whether the deficiencies it has identified are so fundamental that further amendment could not correct them, *see Cozzarelli*, 549 F.3d at 630, given that many of the Court's concerns relate to the non-specificity of the allegations made by the two FEs quoted in the Amended Complaint. Although Plaintiffs' counsel conceded that they contacted other former employees beyond FE1 and FE2 prior to filing the Amended Complaint, *see id.* at 47:5-22, more FEs with more specific allegations could possibly correct at least some of the Amended Complaint's scienter deficiencies. And while Defendants draw the Court's attention to problems with Plaintiffs' allegations concerning statements that, in their view, are forward-looking or puffery, *see, e.g.*, Dkt. 104 at 9-12, even Defendants agree that at least some of Plaintiffs' allegations concern present statements of fact, *see* Hr'g Tr. 7:22-8:3. In fact, Defendants seek dismissal of those misstatements primarily because the FEs' allegations are too non-specific to support falsity or scienter. *See id.* at 59:4-18; Dkt. 104 at 5-6.

But while the Court will not bar future amendment, it will not grant Plaintiffs leave to amend. Plaintiffs only requested leave through a single-sentence passing shot in their opposition brief. *See* Dkt. 112 at 34. That request is not sufficient to seek leave to amend. *See Cozzarelli*, 549 F.3d at 630 (request for leave to amend in a footnote of securities plaintiffs' opposition brief and in final sentence of their objections to the magistrate judge's report and recommendation "did not qualify as motions for leave to amend");

57

*MacroGenics*, 61 F.4th at 394 (footnoted request for leave to amend that "did not present the district court with a proposed amended complaint" did not meet the requirements to be considered a proper motion for leave to amend). Nor have Plaintiffs presented an adequate case at this time that any future amendment would be meritorious. Thus, whether further amendment is warranted is a question for another day, *see* Fed. R. Civ. P. 15(a)(2), assuming Plaintiffs do, in fact, opt for further amendment, *cf. Britt v. DeJoy*, 45 F.4th 790, 797 (4th Cir. 2022) (en banc) (a without-prejudice dismissal that resolves all claims is a final, appealable order).

## CONCLUSION

Certainly, Defendants and investors hoped that MVF would grant Wolfspeed a competitive advantage in the silicon carbide marketplace and help recharge the Company's market position. But the mere fact that MVF failed to achieve the lofty goals set by the Defendants does not mean that they intentionally or recklessly defrauded investors about the project. Nor does the Company's optimistic view of demand during a turbulent period reveal hidden nefarious intent. From Plaintiffs' perspective, it may appear in retrospect that Defendants' public position during the Class Period was foolhardy, but the federal securities laws are not designed to relitigate the "merits of a subjective business judgment." *See Triangle Cap.*, 988 F.3d at 754. Plaintiffs' allegations are exactly of the sort that Congress intended the PSLRA to curtail. *See Tellabs*, 551 U.S. at 314 (a "strong inference" of scienter "must be more than merely plausible or

58

reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent"). Plaintiffs' Amended Complaint fails to create a strong inference that Defendants knew of or recklessly disregarded information contrary to their disclosures. And they may not wield the benefit of hindsight to transform the Company's subsequent financial trouble into fraud. *See Triangle Cap.*, 988 F.3d at 754-55. The Amended Complaint is thus DISMISSED WITHOUT PREJUDICE.

A separate Judgment dismissing this action will be filed contemporaneously with this Memorandum Opinion and Order.

It is SO ORDERED.

This the 12th day of August, 2026.


LINDSEY A. FREEMAN
UNITED STATES DISTRICT JUDGE

59